UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURA BENY,

                     Plaintiff,                     Case Number 22-12021

v.                                          Honorable David M. Lawson

UNIVERSITY OF MICHIGAN BOARD OF
REGENTS, MARK M. WEST, and
UNIVERSITY OF MICHIGAN LAW SCHOOL,

                     Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING MOTION TO STAY DISCOVERY

Laura Beny, a tenured law professor at the University of Michigan law school, filed a complaint (later amended) alleging discrimination, hostile work environment, and retaliation claims against the University Board of Regents, the law school, and the law school dean under federal and Michigan law. The defendants have moved to dismiss the complaint, asserting immunity defenses and arguing that, for several reasons, the pleading does not state viable claims. The defendants also moved to stay discovery until they received a ruling on their dismissal motions. The Court heard oral argument on the motions on March 1, 2023, but delayed ruling on them at the parties' request while they made a settlement attempt with a mediator. They recently reported that their attempt was unsuccessful.

The plaintiff's amended complaint contains multiple pleading defects, including claims barred by sovereign immunity or that are not cognizable against individual defendants. The plaintiff also has failed to plead facts demonstrating that she suffered harassment at the Law School on the basis of her protected statuses or connecting the adverse employment actions she suffered to race, gender, or familial status discrimination. However, taking the alleged facts as true and

drawing reasonable inferences in the plaintiff's favor, the amended complaint plausibly pleads a federal retaliation claim against the defendant Board of Regents and state law discrimination and retaliation claims against defendant West. The motion to dismiss, therefore, will be granted in part and denied in part. The motion to stay discovery any further will be denied.

I. Facts and Proceedings

The following facts are alleged in the plaintiff's 74-page first amended complaint.

Plaintiff Laura Beny is a tenured professor at the University of Michigan Law School, where she has taught law and economics since 2003. She holds a law degree and an economics doctorate from Harvard University, has published research in numerous prestigious publications, and, in 2019, was named the University of Michigan's Earl Warren DeLano Professor of Law. Beny was the second Black female tenure-track professor hired at the Law School and at times since has been one of only two Black tenured professors on the faculty. Recruiting and hiring other diverse faculty members is a priority for the plaintiff, who has dedicated significant time and energy to efforts to improve diversity, equity, and inclusion within the Law School community.

Despite her own advocacy, Beny says that she has been subjected to inequitable treatment throughout her time at the Law School. The amended complaint recites numerous slights and insults that the plaintiff experienced as early as 2003, including being called a "young gal" by a senior, white male professor; being disrupted by a white male student while lecturing; receiving fewer research and fellowship opportunities than white or married professors in her cohort; and overhearing gender and race-based comments from other professors. Beny acknowledges, however, that these incidents occurred far outside the relevant statutes of limitations.

In 2008, the same year the plaintiff was granted tenure, defendant Mark West became the Associate Dean of the Law School. Beny alleges that West made numerous statements to her by

email that she found to be inappropriate.  For instance, West emailed her in 2009 to note that he saw her downtown and ask why she made her male companion walk two feet behind her.  After another off-campus encounter that year, West emailed Beny to ask why she seemed startled to see him; when she said she did not recognize him in "street clothes," he responded that "some people can't get used to how awesome I look in different settings."  Am. Compl., ECF No. 34, ¶ 37, PageID.477.  In early 2010, West joked to Beny in an email that he was going to put a picture of her infant daughter on his desk and tell everyone the child was his.  At the time, Beny was the only single parent on the faculty.  And in late 2010, West emailed her to report that the Law School communications office was "all over [his] ass" to cajole her to sit for a photo shoot due to her "beauty;" he signed the email, "Your humble minion, Mark XOXOXO."  *Id.* at ¶ 39, PageID.478.  Beny interpreted the first and last emails to suggest that she was a dominatrix, and the other two emails to be sexual in nature.  Around January 23, 2022, West formally apologized to the plaintiff in writing for sending one of the 2010 emails.

Defendant West became the Dean of the Law School in 2013.  Thereafter, Beny contends, she continued to experience racial hostility from other faculty members and faced resistance in her diversity, equity, and inclusion efforts.  In 2013, a white male professor in her cohort, John Pottow, called her a "hegemonist" in response to her feedback on the academic scholarship of several potential professors for hire.  The same professor received a chaired professorship the next year, an honor that was not bestowed on the plaintiff until 2019.  Beny met with defendant West and Associate Dean Monica Hakimi around the same time to discuss institutional inequities at the Law School but was met with condescension and told to "let it go."  *Id.* at ¶ 46, PageID.481.  When she offered remarks at an alumni meeting, also in 2014, she was treated dismissively by male professors and cut short, and defendant West did nothing in response.  Again, the plaintiff recites

these events at some length despite acknowledging that they do not form the basis for her present claims.

Meanwhile, Beny learned that her salary was lower than Pottow's salary and was lower than professor Jill Horwitz's salary in 2012, even though Pottow and Horwitz were in her cohort and it was Law School policy for cohort salaries to move in "lock step." *Id.* at ¶¶ 47-48, PageID.481-82. Concerned that she was being penalized for championing equity, the plaintiff immediately asked for a meeting with defendant West. West explained that the discrepancy was a clerical error caused by his predecessor in 2011 or 2012 and that he had put in for a retroactive pay increase to bring the plaintiff back in "lock step" with the other professors in her cohort. However, he did not also fulfill her request to be appointed to the personnel or educational environment faculty committees.

In 2015 or 2016, Beny filed a formal complaint of gender discrimination with the University's Office of Institutional Equity (OIE) and requested an investigation of salary inequities among Law School faculty. OIE conducted an investigation and concluded that there was no discrimination or retaliation against the plaintiff, but it never provided the plaintiff with any evidence of the investigation or justification for her lower salary. In 2017, Beny took a medical leave of absence due to the cumulative toll of her hostile work environment.

Beny also alleges that following the filing of the OIE complaint, she experienced increased retaliation and hostility at the Law School. The amended complaint details several alleged incidents at length. Although Beny organized a conference and writing retreat attended by more than 100 professors of color in 2017, the University never interviewed a single conference attendee. Likewise, in fall 2018, defendant West did not invite any of the Black female candidates that Beny identified as recruitment prospects to meet with the personnel committee, despite his

personally asking Beny to compile the names.  Beny was also denied the opportunity to teach in

the new Masters of Corporate Law summer program, a lucrative role that has been offered to every

other faculty member in the corporate law group.

During this period, Beny says that she repeatedly was disciplined for conduct she alleges

that white professors engage in with impunity.  In April 2018, University students organized an

international conference but invited mostly white males to participate.  When the students did not

respond to an email Beny sent them expressing her concerns about the selection process, she

decided to speak out at the conference.  She made several minutes of remarks during the opening

ceremony noting that the organizers were perpetuating racism.  Several days later, defendant West

called Beny into a meeting with himself and the Law School's Chief Operating Officer, Michele

Fraser Wing, to ask her what occurred at the student conference.  To her surprise, the meeting was

disciplinary in nature, which the plaintiff did not learn until West and Wing called her into a second

meeting and provided her with a disciplinary letter.  Beny believes that she was not afforded

adequate due process, that the letter perpetuated racial and sexist tropes of "angry Black women,"

and that white professors were not similarly disciplined for making racist remarks to students.

Then, in October 2018, Beny had a disagreement with defendant West's administrative

assistant outside West's office.  After Beny emailed the assistant the next morning to apologize,

West emailed Beny and told her not to go to his office suite to speak to the assistant.  He then

called her into a meeting with himself and Wing, which Beny again did not realize was disciplinary

until after the fact.  Three months later, West scheduled a follow-up meeting with the plaintiff and

Wing, where he provided Beny with a memorandum informing her that her sabbatical eligibility

would be delayed as a sanction for the October 2018 incident, and that she could be subject to

further sanctions if she engaged in similar conduct in the future.  Beny believed that the

memorandum contained false allegations and was issued in retaliation for her civil rights advocacy at the Law School, and she refused to sign it.  Around the same time, students reported a white male professor's racism to West, who responded that there is nothing he could do beyond asking the professor to apologize.

In fall 2019, Beny again took medical leave for work-related psychological trauma.  She was on leave from September to December 2019.

In March 2021, defendant West published a letter to the Michigan Law community apologizing for using on some of his book covers images of Asian women that trade in racial and sexual stereotypes.  That December, the plaintiff shared with her faculty colleagues that West similarly had made inappropriate comments that racialized and sexualized her.  She sent emails to more than one hundred professors asking for help, but only four responded.  Meanwhile, Associate Dean Kristina Daugirdas began monitoring Beny in the classroom; during the fall semester, Daugirdas reported Beny to West for improperly taking off her mask, grading her students too highly on the curve, and teaching on Zoom because her child had been exposed to COVID-19. Beny again alleges that other professors engaged in similar conduct without penalty, contending in particular that married professors were permitted to teach on Zoom when their children were exposed to the coronavirus.

In early February 2022, Beny expressed to Daugirdas her concern that Daugirdas had handled a potential civil rights violation improperly by refusing to listen to a student who raised the possibility that a grade she received was the product of racial and gender bias.  On February 8, 2022, the plaintiff informed Wing that she had filed a complaint with the University Equity Civil Rights and Title IX (ECRT) office and the Equal Employment Opportunity Commission regarding the discrimination and retaliation she was experiencing.  The next day, Daugirdas emailed Beny,

directing her to attend a meeting with her and Wing on February 14, 2022 regarding an anonymous complaint a student allegedly submitted regarding Beny's Enterprise Organization course.  Beny responded that she could not meet so early in the morning due to her caregiving obligations and that she needed to find an attorney or support person to attend the meeting with her.  Beny also believed that the complaint contained false allegations, most notably that she had assigned problems on January 16, 2022 and made them due the next day, and that she performed poorly in class on January 17, 2022.  That could not have been the case, the plaintiff contends, because January 17, 2022 was a federal holiday and class did not meet on that day.  Beny says she was traumatized by the allegations.

On February 12 and 13, 2022, Beny emailed Daugirdas and Wing written responses to the student's complaint as well as praise she had received from other students.  Daugirdas and Wing responded by accusing Beny of refusing to meet with them.  During the next meeting of her Enterprise Organization course on February 14, 2022, Beny addressed the anonymous student complaint.  Discussing the complaint for about ten minutes, Beny told the students that she welcomed constructive criticism but asked them not to spread malicious lies.  Beny then proceeded to lecture; she thought that the session, which was recorded on Zoom, ended well.  Shortly after class, however, Daugirdas emailed the plaintiff accusing her of retaliating against students by discussing the complaint.  Feeling humiliated, Beny informed her students by email that she could no longer teach the class due to severe monitoring, harassment, and retaliation.

Beny then took medical leave.  On February 18, 2022, she was blocked from accessing the internal student "Canvas" site for her Enterprise Organization class.  The site holds all of her class material, including the material she created and the lecture videos to which she holds copyrights pursuant to University policy.

On February 16, 2022, Beny retained a lawyer and informed the Law School so that they could finally meet regarding the anonymous student complaint.  A meeting took place on February 25, 2022 with Beny, her lawyer, defendant West, Daugirdas, and a human resources representative. During the meeting, West admitted that he had not read the anonymous complaint and accused the plaintiff of abandoning her duties.  Beny insisted that she had not voluntarily left her classroom but rather was forced out due to false accusations and extreme psychological distress.

On February 26 or 27, 2022, Beny filed an online claim for medical leave citing work-related psychological injury.  Although she inadvertently submitted a workers compensation form instead, she took steps to ensure that her claim was being submitted under the Family Medical Leave Act and was informed that the applications essentially were the same.  On February 27, 2022, Beny received an email from Work Connections informing her that her supervisor had been informed of her claim.  Beny began seeing a professional service provider two times a week.

On March 31, 2022, defendant West sent Beny a disciplinary letter imposing severe sanctions, including an effective demotion.  The letter stated that she would not be eligible for any "salary increases, summer funding, Wolfson funds, Cook funds, or any type of discretionary leave, including sabbaticals" until June 30, 2027, and that her salary would not return to that of her cohort after that date.  The letter further accused Beny of abandoning her teaching responsibilities, retaliating against her students, not contributing to scholarship, and possibly carrying a gun to the Law School campus.

On April 12, 2022, University Payroll sent an email to defendant West informing him that Beny was being placed on medical leave.  Although the email was sent in error, on April 15, 2022, Beny and the University administration received another email stating that the plaintiff met the conditions for FMLA eligibility due to her "serious health condition" and had provided

information "sufficient to support disability for the period of 2/15/2022 – 5/15/2022." *Id.* at ¶ 95, PageID.507.

Beny was released from medical leave on May 16, 2022. Shortly thereafter, Beny submitted to defendant West a plan for returning to her work responsibilities, provided she is not subjected to discrimination and retaliation. She also contacted West about her teaching schedule for the 2022-23 academic year. West responded on June 21, 2022 rejecting the plaintiff's proposal, directing her immediately to submit a satisfactory plan, and informing her that she would not be teaching again or serving on any faculty committee for an indefinite period. Beny submitted a revised return-to-work plan on July 28, 2022. West responded in September reiterating that the plaintiff would not be performing teaching or committee service responsibilities. Beny repeatedly has asked West to reconsider.

Beny has not returned to the classroom since receiving the March 2022 disciplinary letter. Nor has she received a performance review, merit pay increase, or other sabbatical or financial-based benefit. To date and despite her professed interest, Beny has never been placed on the personnel committee, nor has she been offered the opportunity to teach in the Masters of Corporate Law summer program.

Beny has continued to reach out to University leadership regarding the racial and gender discrimination she believes she faced at the Law School. She provided verbal or written statements to former Vice Provost of Diversity, Equity, and Inclusion Robert Sellers multiple times between 2016 and 2022. She also informed former Provost Martin Philbert in writing in 2019 that she was experiencing discrimination, disparate treatment, and a hostile work environment. Between November 2021 and August 2022, Beny submitted numerous complaints to the UM Equity Civil

Rights and Title IX office regarding disparate treatment and retaliation.  And, in 2022, Beny wrote to Interim Provost Susan Collins to make a similar report.

Beny also filed a charge with the EEOC, dated May 13, 2022, alleging discrimination and retaliation on the basis of race, gender, and disability.  She alleges that the defendants were aware of the EEOC complaint.  She received a right to sue letter from the EEOC on May 31, 2022.

The plaintiff filed her original complaint in this Court on August 26, 2022, pleading claims against the University of Michigan, the University of Michigan Law School, and Mark West.  The defendants responded by filing a motion to dismiss.  They also filed a motion to stay discovery until the Court rules on their motion to dismiss.

By stipulation of the parties, the plaintiff was granted leave to and did amend her complaint on January 13, 2023.  The amended complaint, which is the current operative pleading, names the university Board of Regents as defendants and pleads a Title VII sex and race discrimination claim (Count 1); Title VII retaliation and hostile work environment claims (Counts 2 and 3); Elliot-Larsen Civil Rights Act (ELCRA) discrimination, hostile work environment, and retaliation claims (Counts 4, 5, and 6); and Persons With Disabilities Civil Rights Act (PWDCRA) discrimination and retaliation claims based on a perceived disability (Counts 7 and 8).  Although Count 1 is pleaded only against the Board of Regents, the remaining claims are pleaded against both the Board of Regents and West in his individual and official capacities.  On February 6, 2023, the defendants renewed their motion to dismiss.  The Court heard oral argument on March 1, 2023 and that motion remained under advisement at the parties' request until they recently informed the Court of their unsuccessful settlement efforts.

## II.  Discussion

The defendants contend that the amended complaint must be dismissed in its entirety for several reasons, some jurisdictional and some merits based.

### A.  Sovereign Immunity

The defendants argue first that all of the plaintiff's state law claims (Counts 4 through 8) against the Board of Regents must be dismissed because the Board enjoys immunity under the Eleventh Amendment.  A motion to dismiss on the ground that sovereign immunity bars the plaintiff's claims properly is treated as a motion to dismiss for lack of subject matter jurisdiction under Civil Rule 12(b)(1).  *See Nair v. Oakland Cnty. Cmty. Mental Health Auth*., 443 F.3d 469, 476 (6th Cir. 2006).

The Supreme Court has explained on a number of occasions that under the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Emps. v. Missouri Pub. Health & Welfare Dep't*, 411 U.S. 279, 280 (1973) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890); *Duhne v. New Jersey*, 251 U.S. 311 (1920); *and Parden v. Terminal R. Co*., 377 U.S. 184 (1964), *overruled on other grounds by Coll. Sav. Bank v. Florida Prepaid Post–Secondary Educ. Expense Bd*., 527 U.S. 666, 676 (1999)).  A suit against a state official in his or her official capacity amounts to a suit against the state.  *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993).

The University of Michigan Board of Regents is a department of the state and thus enjoys immunity from suit under the Eleventh Amendment.  *Estate of Ritter v. Univ. of Michigan*, 851 F.2d 846, 850-51 (6th Cir. 1988); *see also Ewing v. Bd. of Regents of Univ. of Michigan*, 552 F. Supp. 881, 884 (E.D. Mich. 1982) (finding that the Board "is a state instrumentality within the meaning of the Eleventh Amendment.").  The Board of Regents has not waived its sovereign

immunity in this case, and neither the ELCRA nor the PWDCRA abrogates the state's Eleventh Amendment immunity. *Ernst v. Rising*, 427 F.3d 351, 368 (6th Cir. 2005). The plaintiff may not sue the Board of Regents under either statute, and her state-law claims against the Board must be dismissed for lack of subject-matter jurisdiction, regardless of the sufficiency of the pleadings on the merits of those claims. *See Thomas v. Noder-Love*, 621 F. App'x 825, 831 (6th Cir. 2015) (dismissing claims against the University of Michigan on sovereign immunity grounds).

The plaintiff resists this conclusion. Pointing to a Michigan Court of Appeals opinion and an unpublished opinion issued by another judge in this district, she contends that the State of Michigan in fact has abrogated its sovereign immunity rights under the ELCRA and PWDCRA. *See Tyrrell v. Univ. of Michigan*, 335 Mich. App. 254, 262, 966 N.W.2d 219, 223 (2020); *Williams v. Univ. of Michigan*, No. 22-CV-10296, 2022 WL 16796741, at *6-7 (E.D. Mich. Nov. 8, 2022). But she misreads both opinions: although the Michigan state legislature has abrogated the State's *governmental* immunity for claims brought under both statutes, ELCRA and PWDCRA claims may be brought against Michigan only in state court. Because a suit under either statute is designed to bring the "State into compliance with *state law*," Michigan's "constitutional immunity from suit prohibits *all* state-law claims filed against [it] in federal court, whether those claims are monetary or injunctive in nature." *Ernst*, 427 F.3d at 368; *see also Baker v. Ferris State Univ.*, 516 F. Supp. 3d 735, 742 (W.D. Mich. 2021) (distinguishing the abrogation of government immunity from the abrogation of sovereign immunity from suit in federal court).

The defendant Board of Regents enjoys sovereign immunity from the plaintiff's ELCRA and PWDCRA claims.

## B.  Title VII Claims Against West

For similar reasons, the plaintiff's Title VII claims against defendant West (Counts 2 and 3) also must be dismissed.  Although the statutory definition of "employer" includes an employer's agents, "Congress did not intend to provide for individual employee/supervisor liability" under Title VII.  *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997).  Accordingly, "[a]n individual cannot be held personally liable for violations of Title VII."  *Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir. 2012).

The plaintiff allows that her Title VII claims are not cognizable against defendant West in his individual capacity; however, she contends that he instead is amenable to suit in his official capacity.  That may be true, but it does not save the plaintiff's federal claims against West.  Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  Where, as here, "the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Ibid.*; *see also Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017) ("In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself.").  Because the plaintiff already has pleaded the same Title VII claims against the Board of Regents, construing the plaintiff's claims to be against West in his official capacity would be redundant.

West cannot be sued under Title VII in his individual capacity.  And the plaintiff's Title VII claims against the Board of Regents — which would be the real party in interest if she sued West in his official capacity — must stand or fall on their own merits.  Either way, West is not a proper defendant for the Title VII claims in any capacity.

C.  State Law Claims Against West

The defendants contend that the plaintiff's state-law claims against West must fail for similar reasons: individual defendants also are not liable in their personal capacities under either the ELCRA or PWDCRA.  Here, it is the defendants who misread the law, at least in part. Although Michigan state courts have not considered the scope of personal liability under the PWDCRA, they plainly have held that individual employer agents are subject to personal liability under the ELCRA.  *Elezovic v. Ford Motor Co*., 472 Mich. 408, 422, 697 N.W.2d 851, 858-59 (2005).

The definition of "educational institution" under Article 4 of the ELCRA encompasses universities as well as "agent[s] of an educational institution."  Mich. Comp. Laws § 37.2401.  The "agent" language mirrors Title VII, which, as noted above, has been interpreted by the court of appeals to preclude individual liability.  Michigan courts, however, have declined to follow that interpretation when applying Articles 2 and 7 of the ECLRA, reasoning that the plain language of the statute, and not the "policy" or "object" behind it, should control.  *Elezovic*, 472 Mich. at 422-23, 697 N.W.2d at 858-59.  Following that reasoning, the Michigan Supreme Court found that an agent of an employer "can be held individually liable under the CRA," and that "under our CRA, individual agent liability exists event if it did not exist under Title VII."  *Ibid*.  It also noted that the "antiretaliation provision of the CRA, [Article 7], is broader than the antidiscrimination provision of the CRA, [Article 2]."  *Id.* at 424, 697 N.W.2d at 860 n.21 (citing *Poches v. Elec. Data Sys. Corp*., 266 F. Supp 2d 623, 627 (E.D. Mich. 2003), and *Rymal v. Baergen*, 262 Mich. App. 274, 296-97, 686 N.W.2d 241, 254 (2004)).  And the state supreme court endorsed a holding by the Michigan Court of Appeals, which "permitted retaliation claims against individuals to go forward."  *Ibid.* (citing *Rymal*, 262 Mich. App. at 297, 686 N.W.2d at 254) (reasoning that Article

7 "could not be drafted in a manner that is any more clear or unambiguous; a 'person,' which by statute and necessity includes an individual, shall not retaliate, and the term invokes individual liability").

The Michigan Supreme Court did not cabin its holding in *Elezovic* to Article 2 of the statute; to the contrary, it repeatedly stated without qualification that individuals may be held liable under the ELCRA's broad umbrella. *Elezovic*, 472 Mich. at 421-25, 697 N.W.2d at 858-61. *But see Doe v. Univ. of Michigan*, 448 F. Supp. 3d 715, 731 (E.D. Mich. 2020) (Tarnow, J.) (declining to exercise supplemental jurisdiction over ELCRA claims against individual educational defendants because "it is not clear that individual defendants as agents of educational institutions are similarly liable in their personal capacities under Article 4."). Moreover, the defendants acknowledge that Article 7 of the statute imposes liability on individuals, and that the plaintiff pleaded a retaliation claim. *See* MTD, ECF No. 37, PageID.562, 576. Article 7's antiretaliation provisions plainly permit plaintiffs to bring retaliation claims against individuals, as the plaintiff has done here. And the defendants do not cite any authority holding that the ELCRA does not provide a cause of action against individual supervisors.

The same cannot be said for the individual claim against West under the PWDCRA. *See, e.g.*, *Anderson v. Detroit Transportation Corp.*, 435 F. Supp. 3d 783, 801 (E.D. Mich. 2020) (Cleland, J.) (noting that individual liability under the statute "is a heavily contested issue on which Michigan courts have not ruled."). Certain courts in this district have endeavored to predict the state law interpretation that Michigan courts might declare. Reasoning that Michigan state courts have interpreted the PWDCRA and the ADA to be even more similar than the ELCRA and Title VII, they have found that the PWDCRA does not impose individual liability on supervisors because the ADA similarly precludes personal liability claims. *See, e.g.*, *Down v. Ann Arbor Pub.*

*Sch.*, No. 17-13456, 2018 WL 6649722, at *4 (E.D. Mich. Dec. 19, 2018) (Edmunds, J.); *Farhat v. Michigan Dep't of Corr.*, No. 12-10864, 2012 WL 5874813, at *4 (E.D. Mich. Nov. 20, 2012) (Roberts, J.) (citing *Chiles v. Mach. Shop*, Inc., 238 Mich. App. 462, 472, 606 N.W.2d 398, 405 (Mich. Ct. App. 1999)).   Other courts have responded by declining to exercise supplemental jurisdiction over PWDCRA individual-liability claims.  *See Anderson*, 435 F. Supp. 3d at 801. Because interpreting the scope of liability under the PWDCRA is a task "best reserved for review by the Michigan courts themselves, who have greater experience and interest in clarifying Michigan law," the better course is to decline supplemental jurisdiction over the individual PWDCRA claim against defendant West.  *Ibid.*; *see also Weser v. Goodson*, 965 F.3d 507, 519 (6th Cir. 2020) (finding that the district court should have declined to exercise supplemental jurisdiction over a novel issue of state law never squarely addressed by state courts where both parties made plausible arguments in favor of their respective positions); 28 U.S.C. § 1367(c)(1); *see also Artis v. D.C.*, --- U.S. ---, 138 S. Ct. 594, 597 (2018) (explaining that "[a] district court may . . . dismiss the related state claims if there is a good reason to decline jurisdiction.").

### D.  Discrimination, Hostile Work Environment, and Retaliation Claims

The plaintiff asserts discrimination, hostile work environment, and retaliation claims against the Board of Regents under Title VII (Counts 1 through 3).  She also asserts similar claims against West under the ELCRA and PWDCRA (Counts 4 through 8).  The plaintiff's Title VII and ELCRA claims properly are considered together, because her discrimination, retaliation, and hostile work environment claims are evaluated under the same standards under both federal and state law.  *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018); *Radtke v. Everett*, 442 Mich. 368, 381-82, 501 N.W.2d 155, 161-62 (1993) (holding that the ELCRA hostile work environment and retaliation analysis mirrors the analysis under Title VII for analogous claims);

*White v. Dep't of Transp.*, 334 Mich. App. 98, 116, 964 N.W.2d 88, 97 (2020) (citing *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 123 n. 20, 517 N.W.2d 19 (1994)).

This aspect of the defendants' motion is brought under Federal Rule of Civil Procedure 12(b)(6), where the Court must determine if "a complaint . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A "claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matthew N. Fulton, DDS, P.C. v. Enclarity, Inc.*, 907 F.3d 948, 951-52 (6th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). When reviewing the motion, the Court "must construe the complaint in the light most favorable to the plaintiff and accept all [factual] allegations as true." *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 252 (6th Cir. 2020) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)).

## 1. Discrimination (Counts 1 and 4)

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex . . . ." 42 U.S.C. § 2000e–2(a)(1). In the ordinary case, to plead a claim of race or gender discrimination under Title VII the plaintiff must state facts that show that the defendant took adverse action against her, and that race or gender was a motivating factor. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). These elements may be established by direct or circumstantial evidence. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). But at the pleading stage, the amended complaint merely must contain "sufficient 'factual content' from which a court, informed by its 'judicial experience and common sense,' could 'draw the

- 17 -

reasonable inference,' that [the defendant employer] 'discriminate[d] against [the plaintiff] with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, religion, sex, or national origin.'" *Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678, 679; 42 U.S.C. § 2000e-2(a)(1)).

The defendants contend that because Beny still is employed as a professor at the Michigan law school, she has not alleged that the defendants subjected her to an adverse action. They are wrong. Suspensions from teaching and committee duties, missed salary increases, funding eligibility, and sabbaticals certainly amount to material changes in the terms or conditions of the plaintiff's employment. Beny adequately alleges that she suffered "a material loss of benefits" and "significantly diminished material responsibilities," as well as a significant loss of prestige. *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 803 (6th Cir. 2004) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886-87 (6th Cir. 1996)), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Considered in light of the "indices . . . unique to [the] particular situation" of academia, the plaintiff's suspension from teaching and faculty committees — two of her three duties as a tenured professor — constitutes a substantial change in her employment status. *Ibid.* Moreover, the suspension of funding and sabbatical benefits was not temporary, or issued pending any investigation, and had the practical effect of reducing the plaintiff's pay. *Cf. Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) ("[S]uspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action."). The pleaded suspension therefore constitutes far more than a "mere inconvenience or an alteration of job responsibilities" or a "bruised ego." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (citations omitted). Rather, the facts in the complaint, taken together, plausibly allege that the plaintiff experienced a "demotion," *White*, 364 F.3d at

797, or "reassignment with significantly different responsibilities" to a less prestigious role, *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 607 (6th Cir. 2019) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008)) (holding that the transfer of a school administrator from a high school to a middle school constituted an adverse employment action).

Nonetheless, the plaintiff has not pleaded sufficient facts to suggest that the defendants discriminated against her on the basis of her race or gender, or, under the ELRCA, her familial status. She acknowledges that she must base her claims on incidents that occurred within the applicable period of limitations. In this case, the critical date is August 26, 2019. *See* 42 U.S.C. § 2000e-5(e)(1)); *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 622 (6th Cir. 1983) [Title VII]; Mich. Comp. Laws § 600.5805; *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 472 Mich. 263, 284, 696 N.W.2d 646, 659 (2005) [ELCRA and PWDCRA]. Even accepting all of the facts alleged in the amended compliant as true, the plaintiff has not pleaded adequate facts to support the inference that her duties or benefits were suspended due to racial animus or because of her sex or familial status.

Beny has not stated in her amended complaint any allegations of incidents after the critical date suggesting that her suspensions were motivated the defendants' intention to discriminate against her based on her race or sex or because she was unmarried. At most, the amended complaint alleges that (1) defendant West sent her emails many years earlier that she interpreted to be sexual in nature; (2) the defendants suspended her teaching responsibilities and other benefits in retaliation for filing internal complaints and taking medical leave; (3) the defendants falsely accused her of wrongdoing to smear her; (4) the defendants meted out less or no discipline to white professors who committed infractions; and (5) the defendants granted white and married professors better teaching opportunities than the plaintiff, and more flexibility to teach by Zoom. The first

allegation pertains to time-barred discriminatory acts, which are not actionable even if they are related to the acts allegedly committed within the statute of limitations. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The second and third allegations are relevant to the plaintiff's retaliation claims, discussed below, but not to her discrimination claims. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014) ("When an employee alleges that an employer has both discriminated and retaliated against him in violation of Title VII, the district court must analyze these claims separately under Title VII, as the elements (and standards) for each claim are distinct."). And the remaining conclusory assertions that the plaintiff was treated less favorably than her white, male, or married colleagues are not sufficient to support an inference of intentional discrimination. Although "disparate treatment of similarly situated people may support an inference of discrimination," the plaintiff has "not identified any similarly situated individuals" whom the defendants treated better during the statutory period, but merely alleged that said individuals exist. *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013). These "naked assertions devoid of further factual enhancement" contribute nothing to the sufficiency of the amended complaint. *Ibid.* (quoting *Iqbal*, 556 U.S. at 678); *see also HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012) ("A complaint that includes only conclusory allegations of discriminatory intent without supporting factual allegations does not sufficiently show entitlement to relief.").

Beny's discrimination claims against the Board of Regents under Title VII (Count 1), and against the Board of Regents and West under the ELCRA (Count 4), are not plausibly set out in the first amended complaint.

2.  Retaliation (Counts 2 and 6)

Beny's retaliation claims fare better.  The elements of a Title VII (and ELCRA) retaliation claim are that (1) an employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against her; and (3) there is a causal link between the protected activity and the adverse employment action.  *See* 42 U.S.C. § 2000e-3(a); *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 796 (6th Cir. 2004), *aff'd* 548 U.S. 53 (2006) (citing *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984)).

First, the multiple complaints Beny submitted to the UM Equity and Civil Rights Office between November 2021 and August 2022 certainly qualify as protected activity, as does the written complaint she made to the interim provost in 2022.  *See* Am. Compl., ¶¶ 64, 79-80, 104, ECF No. 34, PageID.487, 498, 510.  "Under Title VII, there are two types of protected activity: participation in a proceeding with the Equal Employment Opportunity Commission ('EEOC') and opposition to an apparent Title VII violation. . . . [C]omplaining about allegedly unlawful conduct to company management is classic opposition activity."  *Wasek v. Arrow Energy Services, Inc.*, 682 F.3d 463, 469 (6th Cir. 2012) (citations omitted).  Moreover, the alleged discriminatory acts need not be actually illegal in order for the opposition clause to apply.  *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015) ("[A]n employee is entitled to protection for opposition to employment practices that may not actually be unlawful under Title VII, [and the] employee who opposes a hostile work environment need not prove that the environment he complained of was actually hostile in order for the employee to receive protection from retaliation under Title VII.").  The plaintiff alleges that she repeatedly reported the discrimination and retaliation she experienced to upper management and the University's civil rights office.  That is sufficient to satisfy the first element of her retaliation claims.

Second, Beny adequately has alleged that the defendants knew about the protected activity, because Beny alleges that, on February 8, 2022, she informed Chief Operating Officer Wing that she had filed the civil rights complaints. *See* Am. Compl., ¶ 80, ECF No. 34, PageID.498-99.

Third, the suspension of Beny's teaching and committee service duties, and suspension of her eligibility for other benefits, count as materially adverse actions against her. As noted above, the suspensions are sufficient to qualify as adverse actions even under the more demanding standard for discrimination claims, as they constituted significant changes in the conditions of the plaintiff's employment that resulted in a significant loss of prestige and economic benefits. Such actions plainly would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Rogers*, 897 F.3d at 776 (quoting *White*, 548 U.S. at 68).

Finally, that Beny's teaching duties and salary benefits were suspended shortly after she made and reported the civil rights complaints is sufficient to support an inference of causation. *See Rogers*, 897 F.3d at 776-77 (6th Cir. 2018) (finding a six-week delay between protected conduct and adverse action sufficient to infer causation); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283-84 (6th Cir. 2012) (collecting cases holding that a two- to three-month time lapse between protected activity and a materially adverse action is sufficient temporal proximity to constitute a *prima facie* case of retaliation)). The defendants contend that the suspensions were motivated by the legitimate business concern of remedying the plaintiff's poor performance, and discovery very well may reveal that to be the case. However, accepting the allegations in the amended complaint as true, as the Court must do at the pleading stage, and drawing from it the reasonable inference that the plaintiff's sudden suspension was causally related to her protected complaints, the plaintiff has stated plausible retaliation claims against the Board of Regents under Title VII (Count 2) and against West under the ELCRA (Count 5).

3.  Hostile Work Environment Claims (Counts 3 and 5)

Beny also asserts hostile work environment claims under both statutes.  Those claims fail for similar reasons as the plaintiff's discrimination claims: Beny has not alleged that she was subjected to unwelcome harassment based on her sex, race, or familial status during the relevant statutory period.

To establish a *prima facie* hostile-work environment claim, the plaintiff must show that "(1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex or race; (4) the harassment created a hostile work environment; and (5) employer liability."  *Ladd v. Grand Trunk Western R.R.*, 552 F.3d 495, 500 (6th Cir. 2009); *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012) (applying Title VII case law to an ELCRA claim).  To be actionable, the harassment must be severe or pervasive in two aspects. "Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim."  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).  These tests are intended to distinguish between "simple teasing, offhand comments, and isolated incidents," which are not actionable, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and a "workplace [that] is permeated with 'discriminatory intimidation, ridicule, and insult,'" which is actionable, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

Beny points to a litany of "hostile actions" that she says characterize the employment environment at the University, including her suspensions, being falsely accused of carrying a gun on campus, being reprimanded for purportedly false student complaints, defendant West apologizing for his book covers, and the five allegations noted above that she pleaded in support

- 23 -

of her discrimination claim.  None of these actions constitute harassment, however, let alone harassment that is "sufficiently severe or pervasive" to "create an abusive working environment." *Harris*, 510 U.S. at 21.  Beny does not allege that she was subject to intimidation or physical threats, *id.* at 21-23; persistent racial slurs, *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999); "inherently" sexual communications, *Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 472 (6th Cir. 2012) (quoting *Corley v. Detroit Bd. of Educ.*, 470 Mich. 274, 279, 681 N.W.2d 342, 345 (2004)); or even the "abusive language, [race]-related jokes, and occasional teasing" that, alone, is insufficient to state a hostile work environment claim, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Rather, she merely contends that she was treated differently than her colleagues and falsely accused of misconduct.  That may have been personally frustrating to the plaintiff.  But the "standards for judging hostility" under Title VII "are sufficiently demanding to . . . filter out complaints attacking the ordinary tribulations of the workplace."  *Ibid.*  That is all that Beny's amended complaint describes here.

Again, Beny points to other conduct alleged in the complaint, including the emails West sent her in 2008 and 2010 and the fact that unidentified white male professors received different treatment.  But the email conduct is time-barred, and the conclusory statements of discrimination are insufficient to state a Title VII or ELCRA claim.  *See Quinto v. Cross & Peters Co.*, 451 Mich. 358, 371, 547 N.W.2d 314, 321 (1996) (finding that a plaintiff's conclusory allegations that supervisor subjected her to harassing comments were insufficient to support hostile work environment claim).  The amended complaint contains no other allegations connecting the plaintiff's discipline or unequal treatment to her protected status after 2019.

Beny has not stated plausible hostile work environment claims against the Board of Regents under Title VII (Count 3) or against West under the ELCRA (Count 6).

### III.  Motion to Stay Discovery

Because the Court has considered the merits of all of the defendants' legal defenses, including the sovereign immunity defenses raised in defense of the plaintiff's state-law claims, there is no reason to delay discovery any further.  The defendants' motion to stay will be denied as moot.

### IV.  Conclusion

The plaintiff's state law claims (Counts 4 through 8) against the Board of Regents must be dismissed because the Board enjoys immunity under the Eleventh Amendment.  The plaintiff's Title VII claims against defendant West (Counts 2 and 3) also must be dismissed because Title VII does not create a cause of action against an employer agent in his individual capacity, and such a claim against West in his official capacity is tantamount to a claim against the Board.  The Court declines to exercise supplemental jurisdiction over the PWDCRA discrimination and retaliation claims against West.  Beny has not pleaded sufficient facts to establish discrimination or hostile work environment claims against the defendants under Title VII or ELRCA, but she adequately has pleaded retaliation claims under Title VII against the Board of Regents (Count 2) and under ELCRA against West (Count 5).

Accordingly, it is **ORDERED** that the defendants' motion to dismiss the amended complaint (ECF No. 37) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Counts 1 and 3 of the amended complaint are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Count 2 and 4 of the amended complaint are **DISMISSED WITH PREJUDICE** against defendant Mark West, **only**.

It is further **ORDERED** that Counts 4, 5, 6, 7, and 8 of the amended complaint are **DISMISSED WITHOUT PREJUDICE** against defendants University of Michigan Board of Regents and University of Michigan Law School, **only**.

It is further **ORDERED** that Counts 7 and 8 of the amended complaint are **DISMISSED WITHOUT PREJUDICE** against defendant Mark West.

It is further **ORDERED** that the motion to dismiss is **DENIED** in all other respects.

It is further **ORDERED** that the original motion to dismiss (ECF No. 11) is **DISMISSED as moot**.

It is further **ORDERED** that the motion to stay discovery (ECF No. 21) is **DENIED**.


s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 7, 2023

- 26 -