UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURA BENY,

                    Plaintiff,                         Case Number 22-12021
v.                                                     Honorable David M. Lawson

UNIVERSITY OF MICHIGAN BOARD OF
REGENTS, and MARK M. WEST,

                    Defendants.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Laura Beny is a tenured professor at the University of Michigan law school, where she is at present a member of the faculty.  In a second amended complaint, Beny accuses the defendants of discriminating and retaliating against her on the basis of her race (Black) and sex (female) in violation of state and federal law.  She also alleges a violation of the Equal Pay Act. Discovery has closed, and the defendants have moved for summary judgment.  They acknowledge that they have imposed employment-related discipline upon Beny, but they argue, among other things, that Beny's own blatantly unprofessional conduct is the only reason for their actions. Because Beny has not produced evidence that the defendants' actions were a pretext for unlawful discrimination or retaliation, she is not able to demonstrate that a fact issue remains for trial on any of her claims.  The motion for summary judgment will be granted, and the case will be dismissed with prejudice.

## I.  Facts and Proceedings

Beny has been a faculty member of the University of Michigan law school since 2003, where she teaches law and economics.  She holds a law degree and an economics doctorate from Harvard University, has published research in numerous prestigious publications, and, in 2019,

was named the Earl Warren DeLano Professor of Law. Beny was the second Black female tenure-track professor hired at the Law School and at times since has been one of only two Black tenured professors on the faculty.

A. Background Allegations

Beny's apparent dissatisfaction with the Law School's diversity and outreach practices, which she would characterize as anemic, likely led to incidents in 2018, which in turn led to the imposition of employment-related sanctions. However, she traces her grievances with former law school dean defendant Mark West to a series of email exchanges starting in 2008, which can be viewed as immature, awkward, and unprofessional, but likely not harassing.

In that year, the same year Beny was granted tenure, defendant West became the Associate Dean of the Law School. Beny alleges that during his time as associate dean, West made several statements to her by email that she found to be inappropriate. The information about these emails has evolved somewhat since Beny filed her complaint, and only some of the emails ultimately have become part of the record. The first instance occurred on May 22, 2008, when West emailed her after a social gathering to remark that it was nice seeing her there. ECF No. 96-21, PageID.2720. Beny responded that she was "honored" by West's presence and noted that the party "totally fell apart" after he left such that her brother almost had to "save the situation with some Air Force strategic tactics." *Ibid.* West responded, "Oh be quiet. I really have missed you and our stupid emails. I wasn't sure how to break the silent impasse. It will be good to have you back. I liked meeting your brother, too. I almost broke his neck just to prove that I could do it, but I held back." *Ibid.*

In early 2010, West told Beny in an email that he was going to put a picture of her infant daughter on his desk and tell everyone the child was his. Mark West dep., ECF No. 109-5,

PageID.4127.  In late 2010, West emailed her to report that the Law School's communications office was "all over [his] ass" to cajole her to sit for a photo shoot due to her "beauty"; he signed the email, "Your humble minion, Mark XOXOXO."  ECF No. 96-19, PageID.2718.  Beny responded, "If I am fucking beautiful, then why does everyone fuck with me!  Anyway, I'm getting a picture in early Jan b/c that threat is scary!:-*"  *Ibid.*  West replied, "Cool. Just get with lisa ASAP so she'll stop bothering me. And watch your fucking language!!"  *Ibid.*

Beny's complaint also included information about two other emails.  She stated that West emailed her in 2009 to remark that he saw her downtown and asked why she made her male companion walk two feet behind her.  That email is not reproduced in the record.  Similarly, the plaintiff also alleged that West emailed her to ask why she seemed startled to see him after another off-campus encounter; when she said she did not recognize him in "street clothes," he responded that "some people can't get used to how awesome I look in different settings."  Am. Compl., ECF No. 34, ¶ 37, PageID.477.  That email also has not been made a part of the record.  Around January 23, 2022, West formally apologized to the plaintiff in writing for sending one of the 2010 emails.  Mark West dep., ECF No. 109-5, PageID.4180; ECF No. 109-4, PageID.4095-96.

## B.  First Discipline-Provoking Incident

In approximately 2018, Beny's time at the University began to be marked by contention.  In April of that year, University students organized an international academic conference, but Beny had heard that organizers did not invite presenters in a manner that would ensure diversity.  Beny dep., ECF No. 109-3, PageID.4003.  When the students did not respond to an email Beny sent them expressing her concerns about the selection process, she decided to speak out at the conference.  Although she was not invited to speak, she attended the conference.  *Id.* at PageID.4001.  After West concluded his opening remarks, she asked if he would take questions.

*Id.* at PageID.4001.  When he declined, she approached the podium and began to speak in front of the attendees, identifying herself as a tenured professor, prominent scholar, taxpayer, and American citizen.  *Id.* at PageID.4001-02.  She stated that the law school had tried to sabotage one of her courses and noted that the conference organizers were perpetuating inequities.  *Ibid.*  When a woman got up and walked towards the front of the room, appearing as if she was on a phone call, Beny accused her of calling the police and urged her to go ahead.  *Id.* at PageID.4002.  When one of the students stood up and asked her to stop speaking, she asked him what country he was from.  *Ibid.*  A few minutes later, she concluded her remarks and the conference continued.

Several days later, defendant West called Beny into a meeting with himself and the Law School's Chief Operating Officer, Michele Frasier Wing, to ask her what occurred at the student conference.  To Beny's surprise, the meeting was disciplinary in nature, which she did not learn until West and Wing called her into a second meeting that May and provided her with a disciplinary letter.  The letter characterized Beny's conduct during the conference as "unprofessional," "inappropriate for any member of the faculty," and "unacceptable."  Notification of Disciplinary Action, ECF No. 96-4, PageID.2664.  The disciplinary letter did not include any consequences but stated that the incident would be taken into account if Beny's conduct was inappropriate in the future.  *Ibid.*  Beny believes that the letter perpetuated racial and sexist tropes of "the angry black woman."  Laura Beny dep., ECF No. 109-3, PageID.4004.  On February 7, 2019, over half a year later, Beny sent West and Wing a memo detailing her disagreements with the disciplinary letter and her belief that her actions were protected speech under University policy.  Emails, ECF No. 109-7, PageID.4193.

C.  Second Discipline-Provoking Incident

In October 2018, Beny had a disagreement with defendant West's administrative assistant, Robyn Grimes, outside West's office.  The nature of this disagreement is disputed, but Beny told the assistant that she felt like she was disrespecting her and did not treat her as an equal member of the community.  She concedes that she may have asked the assistant whether she had a soul. The assistant ended the conversation by returning to her office.  After Beny emailed the assistant the next morning to apologize, West emailed Beny and told her not to go to his office suite to speak to the assistant.  Second Notification of Disciplinary Action, ECF No. 96-6, PageID.2668. On November 6, 2018, West called Beny into a meeting with himself and Wing to discuss the incident with Grimes.  Laura Beny dep., ECF No. 109-3, PageID.4007.  Beny refused to provide him any details about the incident.  *Id.* at PageID.4008.  Three months later, West scheduled a follow-up meeting with Beny and Wing.  *Id.* at PageID.4008-09.  Beny responded by asking why she needed to keep meeting with him when students have informed her of instances of "blatant racism" in the law school.  *Id.* at PageID.4009.  West assured her that he also cared about addressing inequities and urged her to direct specific allegations to himself or to the University's equity office.  *Ibid.*  On February 7, 2019, West provided Beny with a memorandum informing her that her eligibility to take a sabbatical would be delayed by a year as a sanction for the October 2018 incident with his assistant and that she could be subject to further sanctions if she engaged in similar conduct in the future.  Mark West dep., ECF No. 109-5, PageID.4185; Second Notification of Disciplinary Action, ECF No. 96-6, PageID.2668-70.

On September 1, 2019, Beny pleaded no contest to a charge of driving under the influence. Laura Beny dep., ECF No. 109-3, PageID.4049.  On September 4, she reached out to West and Associate Dean Gil Seinfeld to inform them that she would be seeking medical leave for the fall

semester because she had been experiencing a health crisis. Both wished her well. *Id.* at PageID.4048. She ultimately spent approximately two weeks in jail on the charge in November of 2019. Beny researched University policies and determined that she did not have to report her arrest and conviction to University officials because it was a misdemeanor. *Id.* at PageID.4049. She returned to her teaching duties the next semester, *id.* at PageID.4050, and the Law School took no action against her as a result of that incident.

### D. Third Discipline-Provoking Incidents

During the Fall of 2021, Beny registered several informal complaints with law school administrators. In one instance, she reported to administrators that she felt singled out by an email from Associate Dean for Academic Programming Kristina Daugirdas asking her to keep her mask on in class as part of the COVID protocol. She also complained to Daugirdas after she suggested that Beny bring her daughter, who had to quarantine due to a COVID-19 outbreak at school, to campus instead of teaching virtually. That semester, Beny also filed a complaint with the University Equity Civil Rights and Title IX (ECRT) office, citing discrimination because she was not asked to teach in one of the law school's summer programs. Laura Beny dep., ECF No. 109-3, PageID.4012-13. She says that the complaint also included allegations against West and Professor Adam Pritchard that went beyond the summer program. *Id.* at PageID.3992-93. As she reviewed her files in preparation for her interview with the equity office, she re-encountered the old emails from West. *Id.* at PageID.4013-4014. She also reviewed a March 2021 apology letter made by West to the Michigan Law School community apologizing for using images of Asian women that trade in racial and sexual stereotypes on some of his book covers. *Id.* at PageID.3988-89.

In late December or early January 2022, Beny began to forward the emails from West to the Law School's faculty email list, encouraging the other faculty members to "comment publicly." *Id.* at PageID.4031; Third Notice of Disciplinary Action, ECF No. 96-17, PageID.2708.   She did not forward her replies to West's messages.   Laura Beny dep., ECF No. 109-3, PageID.4017.   On January 28, 2022, she forwarded one of the emails to administrator Wing asking her to look into potential Title IX issues.   *Id.* at PageID.4014.   Wing directed her to the ECRT office.   *Ibid.*   Beny says that she informed West around February 7, 2022 that she included him in her ECRT complaint.   *Id.* at PageID.3993.   On February 8, 2022, she emailed Wing with the same information, although her email also accused Wing of "harming me and my family."   *Id.* at PageID.3993, 4015; Emails, ECF No. 113, PageID.4434.

On January 31, 2022, Dean of Students Kimberly D'Haene forwarded Daugirdas an anonymous student complaint about Beny's Enterprise Organization course.   The complaint generally raised concerns regarding Beny's preparedness and tardiness to class.   Emails, ECF No. 96-9, PageID.2677.   Daugirdas forwarded the email to Wing the same day she received it.   *Id.* at PageID.2676.   On February 9, 2022, Daugirdas emailed Beny to set up a meeting with her and Wing to discuss the complaint.   Emails, ECF No. 96-10, PageID.2682.   Beny responded that she was not comfortable meeting while her ECRT complaint was pending against the administration. *Ibid.*   Daugirdas informed Beny that the meeting was not optional and detailed the contents of the student complaint.   *Id.* at 2681-82.   Beny and Daugirdas exchanged several additional emails about whether a meeting to discuss the complaint was appropriate, but Beny again emphasized that she would not meet with administrators without counsel due to her pending civil rights complaints.   *Id.* at PageID.2680.   She also wrote, "[I]f you continue to push me, I will have to go very public with some of the conduct of the members of this admin toward me that has had an extremely negative

impact on the environment here.  It will be very embarrassing for this law school, to say the least." *Ibid.*  Beny filed another ECRT complaint on February 13, 2022, naming West, Daugirdas, and Wing as persons involved.  Laura Beny dep., ECF No. 109-3, PageID.4017.

On February 14, 2022, Beny addressed the anonymous student complaint with her class. Discussing the complaint for about ten minutes, Beny told the students that she welcomed constructive criticism but asked them not to spread "malicious lies."  *Id.* at PageID.4034.  She was particularly concerned by an allegation that she had called for assignments to be due on January 17, which could not be true, she maintained, because that was Martin Luther King, Jr. Day, and there was no class.  *Ibid.*  After concluding her remarks, she returned to the course's subject matter. She thought that the session, which was recorded on Zoom, ended well.  *Id.* at PageID.4075.  On February 15, Daugirdas received a follow-up to the anonymous student complaint, which took issue with how Beny had handled the initial complaint in class and raised additional concerns about the course.  Emails, ECF No. 96-12, PageID.2691.  Daugirdas emailed Beny, stating that administrators would conduct a midterm evaluation in her course and directing her to teach on time and in person and to refrain from any acts that could be considered retaliatory.  Emails, ECF No. 113, PageID.4517-18.  At that point, Beny emailed her students, stating,

> Dear Students:
>
> I am unable to teach at this law school anymore while subjected to arbitrary abuse and retaliation.  I love each of you for what you bring to the world.  Just know that you are valued for who you are.
>
> I have not resigned but the administration has taken over my teaching and pedagogical decisions,
>
> I love each of you for what you bring to the world. Thanks.
>
> Thanks.

Emails, ECF No. 96-13, PageID.2693.

When Daugirdas learned of Beny's email to the students, she contacted Beny to confirm. Emails, ECF No. 96-14, PageID.2694.  Copying several additional administrators, Beny responded that she "decided not to continue teaching under your continued racism and retaliation" and requested that Daugirdas refrain from contacting her directly.  *Ibid.*  She also sent a separate email to Daugirdas, West, and Wing complaining about Daugirdas's concerns about her course and stating that "evil is often sloppy."  Emails, ECF No. 113, PageID.4518.  On February 19, she informed a student that she could no longer serve on his dissertation committee.  Emails, ECF No. 96-16, PageID.2697.

A meeting between administrators and Beny ultimately occurred on February 25, after she had retained an attorney.  Laura Beny dep., ECF No. 109-3, PageID.4040.  West, Daugirdas, and Sascha Matish, a university HR employee, attended the Zoom session, which was meant to discuss the student-complaint incident.  *Ibid.*  West testified at deposition that he had not read the student complaint before the meeting and was unaware of how Beny had addressed it in class.  ECF No. 109-5, PageID.4155.  During the month of February, Beny continued to send emails to the law school email list and to individual faculty and staff.  Third Notice of Disciplinary Action, ECF No. 96-17, PageID.2708. The emails and communications are numerous, and Beny does not contest making them.  ECF No. 109-3, PageID.4040.  They include:

- An email to all faculty members asking if any had "swallow[ed] this level of abuse and perform[ed] at the highest levels of performance for decades?"  ECF No. 96-17, PageID.2708.

- An email to all faculty members accusing them of silence.  *Ibid.*

- An email to all faculty members that included a rhetorical "Email I Never Received."  *Ibid.*

- In response to an email announcing new faculty hires, an email to all faculty members, remarking, "What is brilliant about hiring qualified candidates? What stands out as especially brilliant? Who is brilliant at this time?"  *Id.* at PageID.2709.

- 9 -

- An email to Daugirdas, Wing, Vice Provost Robert Sellers, and Senior Investigator Tanya Castrogiovanni accusing administrators of an "incompetent" investigation into her complaints. *Id.* at PageID.2710.

- An email to the same individuals inquiring how "the dean and associate dean [got] so far as they did when they were not great teachers?" *Ibid.*

- An email to Daugirdas and Wing with an attached article about bullying. *Id.* at PageID.2711.

- An email to Daugirdas and Wing stating, "So. You are evil. And this is where I go public. Good luck to you. Let's see how you do." *Ibid.*

- Several emails to West, calling him, among other things, "a diehard racist and sexist liar," noting that his "own teaching record isn't great but [he] got to be dean," and accusing him of retaliation because she "outed [your] inappropriate comments and behaviors towards me as my supervisor." *Id.* at PageID.2712.

- An email to Professor Vic Khanna, the replacement instructor for her course, stating that he would be "dragged into my lawyers [sic] investigation and EEOC complaint" if he did not give her access to her course materials. *Id.* at PageID.2713; Laura Beny dep., ECF No. 109-3, PageID.4041.

- A phone call to a staff member requesting access to the Enterprise Organizations course website because she "doesn't want to find herself on the wrong side of these issues." ECF No. 96-17, PageID.2713.

- Several emails to Professor Nick Bagley, who is married to Daugirdas, accusing both of racism and "attacks against me." *Id.* at PageID.2713-14.

Some of these emails provoked a response from Professor Barbara McQuade, who testified at her deposition that she contacted West to suggest that he request a threat assessment after seeing several of Beny's emails. Barbara McQuade dep., ECF No. 114, PageID.4531. The email that prompted the concern was Beny's February 23, 2022 communication to the faculty asking, "how many of you had to swallow this level and abuse and perform at the highest levels of performance for decades?" *Id.* at PageID.4533. The next day, Beny emailed the faculty again, stating "Yes, I didn't think that anyone else did and your silence confirms that. I think it's a wonderful privilege

- 10 -

to be able to focus on your work, teaching and research, without constant abuse and retaliation. Congratulations to you." *Ibid.*

McQuade, one of the recipients, testified that she found the email "chilling because it appear[ed] to be directed . . . to all of us." *Ibid.* She did not know of Beny's prior complaints against officials at the law school, had never met Beny in person, and was unaware of her race. *Id.* at PageID.4535-36, 4548. She acknowledged that while the email could be read as an expression of hurt, she viewed it differently; its use of "retaliation" and "congratulations to you" caused her concern. McQuade then called West and encouraged him to contact the University's Department of Public Safety instead of remaining "stoic," which she explained was a natural reaction in these situations. *Id.* at PageID.4532.

In context, McQuade's response could be characterized as an overreaction. However, University police records indicate that West otherwise was motivated to request a threat assessment after he received an email from Professor Alicia Davis, a Black female member of the faculty, stating that Beny had phoned her and asked, "what evil, Satanic motive drives you" and later texted her, "God will deal with you." Police Report, ECF No. 111, PageID.4233; Mark West dep., ECF No. 109-5, PageID.4133. Davis reported that phone call in an email to West on February 24, 2022. ECF No. 96-25, PageID.2728. She characterized the phone call as "incredibly disturbing." She wrote that Beny sounded "very distraught" and said that she had "f**ked her up and dragged her down at every opportunity." *Ibid.* Beny also asked Davis "what evil, Satanic motive drives you?" *Ibid.* Davis told Beny that she intended to end the call and did not want to have similar conversations going forward, but Beny hung up before she could finish speaking. *Ibid.* Beny then texted Davis "God will deal with you." *Ibid.* Davis reported to West that she did not feel safe and asked what actions the administration would take. *Ibid.* During her deposition,

- 11 -

Beny admitted making those statements but denied that they were intended as threats. She maintains that she and Davis were discussing what she was going through at the law school. Laura Beny dep., ECF No. 109-3, PageID.4071. She admits, however, that she accused Davis of "undermining [her] on every opportunity that she got." *Ibid.*

This was not the first time that administrators had sought a threat assessment concerning Beny. In April 2018, before the incident at the student scholarship conference, police records indicate that University Vice President Tim Lynch contacted the school's public safety department to request a threat assessment of Beny. ECF No. 109-2, PageID.3964. Kevin Crowley, the responding officer, contacted West to discuss Beny. *Id.* at PageID.3965. West reportedly stated that Beny "displays delusions of grandeur where she will talk about herself in the third person" and believes "everyone is out to get her." *Ibid.* West reportedly added that there is "growing concern from staff that if Laura does something happens [sic] in the future they would look back and ask if there would be signs." *Ibid.* In his interview with the responding investigator, West recalled that during a fundraiser auction for public service students, Beny engaged in "some kind of a protest," bidding the price for an event at a restaurant with him to $3,700, and then taking the podium in front of approximately 300 students and "admonish[ing] the crowd for some reason." ECF No. 109-2, PageID.3964; Mark West dep., ECF No. 109-5, PageID.4140. She then gave the "Wakanda" salute (an apparent reference to the Kingdom of Wakanda, a fictional country appearing in American comic books published by Marvel Comics and featured in the Black Panther movies) and exited the building. Mark West dep., ECF No. 109-5, PageID.4140. During his deposition, West estimated that this event took place in 2015, *ibid.*, but the contemporaneous University police records indicate that West expressed his concerns about this conduct in March of 2018, ECF No. 109-2, PageID.3964. On April 20, 2018, West updated his report to the

investigator after Beny's disruption of the student conference.  *Id.* at 3968.  The report was closed

after Crowley reported that he stood by in an adjacent room while West met with Beny to discuss

the incident at the conference.  *Id.* at PageID.3968.

On March 31, 2022, West issued Beny a Third Notice of Disciplinary Action.  ECF No.

96-17, PageID.2702. As a sanction, Beny's pay was frozen through June 30, 2027, and she was

made ineligible for summer funding, several other funding sources, and sabbaticals.  *Id.* at

PageID.2715.  The letter also explained that Beny's salary would not return to that of her cohort

and requested that she prepare a "detailed plan" for returning to her responsibilities as a faculty

member.  *Id.* at PageID.2715-16.   As justification, the notice principally cited Beny's

"abandonment" of her class and "retaliation" against the students, but also cited her for

- Failing to attend and evaluate assigned courses as a member of the Academic Standards and Practice Committee.  ECF No. 96-17, PageID.2705-06.

- Being the only tenured faculty member not on leave to fail to attend any faculty meetings or job talks during the academic year.  *Id.* at PageID.2706.

- Retaliating against students who made an anonymous complaint in her course by "[taking] bits and pieces of the complaint and ridicul[ing] it."  *Id.* at PageID.2706-07.

- Using the faculty email list to send numerous emails about her grievances.  *Id.* at PageID.2707-08.

- Making threatening and harassing statements to various faculty and staff, discussed above. *Id.* at PageID.2713.

The notice also stated:

> We recognize that you claim that your refusal to perform the responsibilities of your position, including not only the actions detailed above but also your failure to produce any original scholarship for several years, is the result of discrimination. The University and the Law School take all claims of discrimination and harassment seriously. The process for reviewing those claims, both internally and externally, has been invoked. These claims, however, do not excuse you from properly performing your job, which includes treating others with civility and respect. Nor do these claims insulate you from the consequences of failing to properly perform your job.

*Id.* at PageID.2715.

On February 26 or 27, 2022, Beny filed an online claim for medical leave citing a work-related psychological injury.  Laura Beny dep., ECF No. 109-3, PageID.4052; Emails, ECF No. 114, PageID.4524.  Although she believed she was applying for leave under the Family Medical Leave Act, she actually had filled out paperwork for a workers' compensation claim.  Laura Beny dep., ECF No. 109-3, PageID.4053; ECF No. 114, PageID.4524.  The form email confirming receipt of Beny's report indicated that her supervisor was copied on the email, but it does not include any specific information about the nature of Beny's claim, and no supervisor appears on the email's list of recipients.  Emails, ECF No. 114, PageID.4524.  On April 8, 2022, she clarified with the University's Work Connections office that she had intended to apply for FMLA leave.  Laura Beny dep., ECF No. 109-3, PageID.4053.  Her leave was approved on April 15, 2022 for the period between February 15, 2022 and May 15, 2022.  Emails, ECF No. 114, PageID.4520-21.  West believes he was made aware of the University's approval of Beny's leave around that date.  Mark West dep., ECF No. 109-5, PageID.4118.

### E.  Subsequent Events

Beny filed a charge with the Equal Employment Opportunity Commission (EEOC) dated May 13, 2022, alleging discrimination and retaliation on the basis of race, gender, and disability.  She received a right-to-sue letter from the EEOC on May 31, 2022.  She reports that her doctor cleared her to return to work on May 16, 2022, but the defendants refused to let her teach a courseload until the Winter 2024 semester.  West stated that he was apprehensive about adding her to the course schedule sooner because he was concerned that she would "abandon" her students again.  Mark West dep., ECF No. 109-5, PageID.4125.  On September 19, 2022, West told Beny via email that he was concerned about aspects of her classroom management, including tardiness

and absenteeism that preceded her 2022 departure from the classroom and directed her to attend

five professional development seminars and provide a personal reflection about the contents.

Laura Beny dep., ECF No. 109-3, PageID.4056.  Beny did not complete this task until May of

2023.  *Ibid.*  On January 19, 2023, she submitted a follow-up EEOC complaint alleging that the

additional requirements for a return to the classroom amounted to retaliation for her initial EEOC

complaint.  EEOC Compl., ECF No. 65-1.  The parties informed the Court at oral argument that

Beny returned to teaching a two-credit course in the 2024 winter term.

### F.  Proceedings

After receiving a right-to-sue letter, the plaintiff filed her complaint in this case on August

26, 2022.  It since has been amended twice, after early motion practice dispensed with some of the

theories of liability.  *See Beny v. Univ. of Michigan Bd. of Regents*, No. 22-12021, 2023 WL

4409107 (E.D. Mich. July 7, 2023).   The present operative pleading is the second amended

complaint, which pleads claims under Title VII of the Civil Rights Act of 1968 and Michigan's

Elliott-Larsen Civil Rights Act (ELCRA) for sex and race discrimination (Counts I and II),

retaliation in violation of the same statutes (Counts III and IV), and an Equal Pay Act claim against

the University of Michigan (Count V).  The Title VII claims are pleaded against the University of

Michigan only, and the ELCRA claims are pleaded against defendant Mark West only.   After the

close of discovery, the defendants moved for summary judgment on all of the plaintiff's claims.

### II.  Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all

reasonable inferences in favor of the non-moving party, and determine 'whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 5558 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Alexander*, 576 F.3d at 558 (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

### A. Discrimination Claims

The defendants contend that Beny's discrimination claims are not viable because most of the alleged adverse employment actions occurred outside the time frame covered by the statute of limitations. They do concede that the Third Notice of Disciplinary Action is not time-barred, but, pivoting, they argue that Beny cannot show discrimination based on that action because she cannot show any comparable white or male peer treated more favorably than she in similar circumstances. The defendants also maintain that they have established non-discriminatory reasons for disciplining her, which are not pretextual based on the undisputed facts.

Beny responds that fact issues preclude summary judgment on several elements of her discrimination claims. She states that the defendants' decision not to select her to teach in one of their summer programs and the March 2022 discipline constitute adverse employment actions.

She argues that she was treated differently from Professor Mathias Reimann, who is a white male alleged to have engaged in abusive conduct towards staff.  She also maintains that the defendants' rationale for her discipline was pretextual because the allegation that she abandoned her class is without factual basis since she was on a medical leave, no other professors have been disciplined by West, and no other professors have received a "threat assessment."

Discrimination and retaliation claims brought under Title VII and ELCRA are evaluated under the same standards.  *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018); *Radtke v. Everett*, 442 Mich. 368, 381-82, 501 N.W.2d 155, 161-62 (1993) (holding that the ELCRA hostile work environment and retaliation analysis mirrors the analysis under Title VII for analogous claims); *White v. Dep't of Transp.*, 334 Mich. App. 98, 116, 964 N.W.2d 88, 97 (2020) (citing *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 123 n.20, 517 N.W.2d 19, 27 n.20 (1994)).

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex . . . ." 42 U.S.C. § 2000e–2(a)(1).  To prove race or sex discrimination under Title VII, the plaintiff must offer evidence that the defendant took adverse action against her and that race or sex was a motivating factor.  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012).  These elements may be established by direct or circumstantial evidence.  *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003).

In the absence of direct evidence of discrimination, as in this case, Title VII claims are subject to the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *as modified in Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under this framework, "the plaintiff must first submit evidence from which a

reasonable jury could conclude that he or she established a prima facie case of discrimination." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009).  For a Title VII discrimination claim, a *prima facie* case consists of proof that (1) the plaintiff is a member of a protected group, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was treated differently than similarly-situated employees that were not part of the protected group.  *Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018).  Once the plaintiff offers evidence sufficient to form a *prima facie* case, "[t]he defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action." *Blair*, 505 F.3d at 524.  If the defendant offers a legitimate motive, then "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Ibid.*  The plaintiff may establish pretext by showing that the employer's stated reason either (1) has no basis in fact, (2) was not the actual reason for the action, or (3) is insufficient to explain the employer's action.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).

### 1. *Prima Facie* Case

Although some of Beny's complaints fall outside the period of limitations, she has alleged certain adverse actions, mentioned earlier, on a timely basis.  She also has shown that she is a member of protected group and that she is qualified for the work and pay that was denied her.  The thrust of the dispute over Beny's *prima facie* case is directed at the fourth element's requirement that the plaintiff identify similarly-situated employees who were treated better than she.  For that, Beny points to Professor Matthew Reimann.  Reimann is a white male who also is a tenured faculty member at the Law School.  Beny has furnished evidence that he: allegedly mistreated his former administrative assistant, Linda Wielfaert, by, among other things pounding her desk, referring to

himself as her "master," urging her to avoid gaining weight during her recovery from an injury, and calling another assistant an "idiot,"  Linda Wielfaert dep., ECF No. 109, PageID.3865-71; allegedly using a rude tone in conversations with Rashida Douglas, the law school's registrar, Kristina Daugirdas dep., ECF No. 111, PageID.4300; allegedly engaging in a "heated" discussion with Daugirdas when she met with him about his interactions with Douglas, *id.* at PageID.4300-01; and allegedly telling two staff members who were working at a law school event, "It must be nice to get paid to sit and do nothing," Emails, ECF No. 111, PageID.4256.

Reimann was not similarly disciplined even though officials were aware of his conduct. Mark West dep., ECF No. 109-5, PageID.4153 (stating that he was aware that there was "some conflict" between Reimann and the administrative assistant but that the conflict "really [did not] rise to [his] level."). The defendants' response, if any, was limited until relatively recently.  In a September 28, 2023 email, West stated that administrators should look to the human resources personnel for guidance and "draft something" for Reimann's file based on the incidents. Emails, ECF No. 111, PageID.4256.  Reimann was directed to apologize to the two staff members working the event who were insulted by his comment.  *Id.* at PageID.4257-58.

Beny also cites as comparators Professors Don Herzog, Carl Schneider, and Karima Bennoune.  During the Fall 2022 semester, a student alleged that Herzog "asked how much money people would accept to experience racism," slammed the door in his face, and refused to answer his questions.  Emails, ECF No. 114, PageID.4572.  The University's equity office reported to West that they would "conduct an educational session" with Herzog.  *Ibid.*  The allegations regarding Schneider concern a claim that a grade he assigned a student in his Art Law course was the result of racial bias.  *Id.* at PageID.4579-82.  Administrators investigated the complaint, and Schneider agreed to amend the grade.  *Id.* at PageID.4582.  The complaint about Bennoune also

involved a student who believed her grade resulted from race, sex, and gender stereotyping. *Id.* at PageID.4587-89.

In cases involving allegations of inconsistent levels of discipline, the Sixth Circuit has identified three factors to gauge similarity: the plaintiff and comparator (1) must share the same supervisor; (2) be subject to the same standards; and (3) have engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The circumstances of the two employees need not be identical, but they must be similar in "all of the *relevant* aspects." *Ibid.* The underlying conduct need not be identical, but more severe sanctions imposed for more egregious conduct will defeat an inference of discrimination. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016).

Professor Reimann easily satisfies the requirements of an out-of-class comparator who was treated less severely than the plaintiff. His alleged conduct, composed mainly of haughty and egotistical behavior and harsh and disrespectful treatment of other University employees, is similarly severe to Beny's. Allegations of abusive practices are serious matters in any workplace. Reimann was not similarly disciplined even though officials were aware of at least some of his conduct. Mark West dep., ECF No.109-5, PageID.4153 (acknowledging that he was aware that there was "some conflict" between Reimann and the administrative assistant but that the conflict "really [did not] rise to [his] level"). The defendants' response, if any, was disproportionally anemic until relatively recently. In a September 28, 2023 email, West merely gave advice to consult with human resources and suggested that a note be placed Reimann's file. Emails, ECF No. 111, PageID.4256. Later, Reimann was told to apologize to the two staff members who were insulted by his derogatory remark. *Id.* at PageID.4257-58.

The defendants argue that Beny's conduct is distinct because her discipline was based on her abandonment of her course mid-semester and "retaliation" against students. But Beny's FMLA leave was backdated by the University to February 15, 2022, the date she informed her class that she could no longer teach. Drawing all inferences in the plaintiff's favor leads to the conclusion that Beny did not "abandon" her course but instead withdrew due to medical circumstances. That conduct, discussed in more detail below, likely was not a violation of any rules. And abusive conduct towards staff members is not so distinct from "retaliatory" conduct towards students. That incident to the side, the greater number of Beny's misconduct incidents seems to have centered on her abuse of the faculty email list-serv and communications towards other staff and faculty members that was perceived as threatening. *See, e.g.*, Third Notice of Discipline, ECF No. 96-17, PageID.2713 ("You phoned a faculty member to ask 'what evil, Satanic motive drives you' and texted 'God will deal with you.'"). The defendants have failed to distinguish that conduct in severity from Reimann's own conduct, which also persisted over time and involved harsh words to multiple recipients. The defendants insist that Beny's conduct is distinguishable because her March 2022 discipline was her third formal discipline, but she disputes the factual basis and the appropriateness of the University's response to each disciplinary event. And to credit such an argument would be to compound past misconduct by a comparator that may have gone unsanctioned for several years. *See* ECF No. 111, PageID.4252 (complaint about Reimann dated October 8, 2021).

Schneider's, Herzog's, and Bennoune's alleged misconduct must be viewed differently. Those events are not similar to Beny's misbehavior. Schneider and Bennoune's misconduct involved a single allegation each of racial or gender discrimination in grading, and the allegations against Herzog concern a charge of racial discrimination in the classroom setting. These incidents,

although deserving of institutional attention, do not match the type or number of allegations regarding Beny's conducts in any relevant aspect.

Nevertheless, because Beny has established that Reimann is a proper comparator who was treated more favorably, she has demonstrated a fact question as to this element of her *prima facie* case.

### 2.  Defendants' Non-discriminatory Response and Pretext

The defendants justify the discipline imposed upon Beny by citing her abandonment of her classroom responsibilities and "problematic behavior" toward students and colleagues.  Employee misconduct is a legitimate basis for an adverse employment action, and the Sixth Circuit has held that threatening statements constitute legitimate reasons for discipline or termination.  *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000).

Beny maintains that these reasons are pretextual.  To win that argument on summary judgment she need only provide evidence "that would allow a jury to find that her employer's stated reason 'is unworthy of credence.'"  *Ames v. Ohio Dep't of Youth Servs.*, 87 F.4th 822, 826 (6th Cir. 2023) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000)).  Here, however, she comes up short.

Starting with her class abandonment, Beny insists that this charge has no evidentiary support because she received FMLA leave, made retroactive to the date she ceased teaching her course.  The defendants respond that the post-hoc leave designation does not suggest Beny's discipline lacked a factual basis and does not excuse her conduct.  And they point out that Beny did not seek FMLA leave until after the discipline was announced.  The relevant administrators testified repeatedly that they only learned of Beny's receipt of FMLA approved leave when it was authorized on April 15, 2022, more than two weeks after they had disciplined her.  Kristina

Daugirdas dep., ECF No. 111, PageID.4310; Mark West dep., ECF No. 109-5, PageID.4118; Laura Beny dep., ECF No. 109-3, PageID.4052 (indicating that she received formal approval for her FMLA leave on April 15, 2022. Moreover, none of Beny's many emails to administrators in February suggested that she was seeking a medical leave, and her emails to the course and her doctoral advisee similarly do not indicate a medical justification for leaving.

During oral argument and in their brief, the defendants cited *Halpern v. Wake Forest University Health Sciences*, 669 F.3d 454 (4th Cir. 2012), for the proposition that "the law does not require [the defendants] to ignore misconduct that has occurred because [the plaintiff] subsequently asserts it was a result of a disability." *Id.* at 465. *Halpern*, an ADA and Rehabilitation Act case involving a student, is not entirely on point but does evoke important considerations that bolster the defendants' argument against pretext.

In *Halpern*, a former medical student who had exhibited unprofessional behavior on multiple occasions alleged that his dismissal from the medical school violated the Rehabilitation Act and Americans with Disabilities Act because the school failed to provide reasonable accommodations for his mental health disabilities. *Id.* at 459-60. The district court granted summary judgment in favor for Wake Forest on the ground that Halpern was not "otherwise qualified" as a medical student because demonstrating professionalism was a fundamental tenet of the program. *Ibid.* The court also held that Halpern's proposed accommodation — which involved obtaining therapeutic treatment, participating in a distressed physicians program, and continuing as a student on strict probation — was unreasonable "because of the uncertainty of the duration and the prospects for success of such behavior modification efforts." *Id.* at 460. The Fourth Circuit affirmed, holding that Halpern failed to demonstrate the existence of a reasonable accommodation that would have permitted him to satisfy the school's professionalism requirement. Rejecting

Halpern's proposed accommodations, the court reasoned in part that the request itself was untimely because it came long after his unprofessional acts. *Id.* at 465. By the time Halpern had requested a remediation plan, "he had already engaged in numerous unprofessional acts that warranted his dismissal, including acting abusively towards staff, multiple unexcused absences, repeated failure to meet deadlines, and tardiness." *Ibid.* His request therefore was not for an accommodation "but for 'a second chance to better control [his] treatable medical condition.'" *Ibid.* (quoting *Hill v. Kan. City Area Transp. Auth.,* 181 F.3d 891, 894 (8th Cir. 1999)).

The court continued:

> A school, if informed that a student has a disability with behavioral manifestations, may be obligated to make accommodations to help the student avoid engaging in misconduct. But, the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability. Halpern's argument that he was owed an opportunity to continue at the Medical School and correct his misbehavior is, therefore, without merit.

*Ibid.*

The defendants here quote the second sentence of this passage. *Halpern*, however, is not on all fours with this case. The University actually *did* approve Beny's FMLA leave request, with an effective date that matched the date she "abandoned" her course. Far from ignoring the alleged abandonment, the University appears to have validated Beny's decision to cease teaching by granting the retroactive FMLA leave. That tends to undermine the defendants' continued reliance on Beny's purported abandonment of her class to support of their prospective discipline.

However, the honest belief rule fortifies the defendants' no-pretext argument. "When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chemical Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713-15 (6th Cir. 2007)). An

employer's belief in the nondiscriminatory reason for its action is "honest" when "'the employer made a reasonably informed and considered decision before taking' the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).  The employer must identify "particularized facts upon which it reasonably relied."  *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012).  The employer's investigation need not be "optimal," and it does not have to show that "it left no stone unturned."  *Smith*, 155 F.3d at 807.

The Sixth Circuit has explained that when facing summary judgment, "the 'plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action.'"  *Tingle*, 692 F.3d at 531 (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001)).  An unadorned argument that "the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact."  *Ibid.* (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)).

Here, the defendants' honest belief in their reasons for disciplining Beny finds ample support in the record.  During oral argument, defense counsel agreed with the Court that their proffered legitimate reasons for Beny's discipline were her "abandonment" of the classroom, retaliation against students who raised concerns about her course, and her troubling communications with other faculty and staff members.  These reasons were supported by an adequate investigation.  West, Daugirdas, Wing, and Sascha Matish, a university HR employee, met with Beny and her attorney on February 25, 2022 to discuss her decision to leave the classroom.  Laura Beny dep., ECF No. 109-3, PageID.4040; Emails, ECF No. 96-10, PageID.2681

(discussing topics of meeting).  At the time of the meeting, Beny had not requested any form of medical leave, and the record does not suggest that she indicated during the meeting any desire to take leave.  Instead, Beny first formally sought leave two days later on February 27, when she filed an online claim form with the University's Work Connections office, citing work-related psychological injury.  Laura Beny dep., ECF No. 109-3, PageID.4052; Emails, ECF No. 114, PageID.4524.  Although Beny believed she was applying for leave under the Family Medical Leave Act, she actually had completed paperwork for a workers' compensation claim.  Laura Beny dep., ECF No. 109-3, at PageID.4053; ECF No. 114, PageID.4524.  And there is little indication that anyone in the Law School became aware of her request for leave.  The form email confirming receipt of Beny's report indicated that her supervisor was copied on the email, but it does not include any specific information about the nature of Beny's claim, and no supervisor appears on the email's list of recipients.  Emails, ECF No. 114, PageID.4524.  On April 8, 2022, she clarified with the Work Connections office that she had intended to apply for FMLA leave.  *Id.* at PageID.4521-22.  Her leave was approved a week later on April 15, 2022, covering the period between February 15, 2022 and May 15, 2022.  *Id.* at PageID.4520-21.  West and Daugirdas both testified that they were not made aware of the FMLA decision until then, nearly two weeks after they had issued Beny her third disciplinary letter.  Mark West dep., ECF No. 109-5, PageID.4118; Kristina Daugirdas dep., ECF No. ECF No. 111, PageID.4310.

There is, therefore, little, if any, record evidence suggesting that the relevant administrators were aware of Beny's intention to take medical leave during their investigation into her conduct.  Rather, the administrators appear to have conducted a thorough review of Beny's actions, as outlined in the 15-page March 31, 2022 disciplinary letter, and even spoke with Beny herself.  Furthermore, a large portion of the conduct at issue was directed at the defendants personally,

- 26 -

obviating some of the need for an extensive investigation.  *See Tingle*, 692 F.3d at 532 (finding sufficient an investigation that included a manager's personal knowledge of the events in question).

Beny's argument regarding the retroactive nature of her leave is insufficient to suggest that the defendants "did not 'honestly believe' in the proffered nondiscriminatory reason[s]" for her discipline. *Braithwaite*, 258 F.3d at 493-94.  At most, it raises questions about the "abandonment" justification because the medical leave excused her workplace attendance.  But even then, at the time of the investigation and decision, West and other administrators were unaware of Beny's request for leave.

Moreover, administrators cited more than her decision to decline teaching her Enterprise Organizations course as justification for her March 2022 discipline.  Those additional instances of misconduct are cataloged above and include non-attendance at required meetings, retaliating against students who filed complaints about her class conduct, and making multiple threatening and harassing statements to various faculty and staff.  *See* ECF No. 96-17, PageID.2706-15.  Beny attempts to rebut some of these grounds, arguing in particular that her discussion of the anonymous complaint with students was not retaliatory.  But Title VII claims are "not a vehicle for litigating the accuracy of the employer's grounds for [discipline]." *Tingle*, 692 F.3d at 530.  And her argument does nothing to undermine the defendants' honest belief in these other cited reasons for the discipline.  The fact that these incidents occurred during a period later determined to be a medical leave is irrelevant.  The FMLA does not operate to erase conduct that has occurred because the law "simply does not force an employer to retain an employee on FMLA leave when the employer would not have retained the employee had the employee not been on FMLA leave." *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005).  And it is well-

- 27 -

understood that employees may be disciplined for misconduct attributed to a disability.  *See Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 739-40 (6th Cir. 2015) ("E.E.O.C. 2008 Guidance and Sixth Circuit case law suggest that where there has been employee misconduct — including nonviolent disruptive misconduct — the employer may terminate the employee for that behavior, even if it is related to his disability."); *see also Hrdlicka v. Gen. Motors LLC*, No. 20-11015, 2022 WL 989339, at *18 (E.D. Mich. Mar. 31, 2022), *aff'd*, 59 F.4th 791 (6th Cir. 2023), *and aff'd*, 63 F.4th 555 (6th Cir. 2023) (collecting cases).  The retroactive nature of Beny's leave may excuse her from workplace responsibilities during the months of her illness, but it does not excuse her from acts of misconduct that occurred during that period, and it does not undermine the defendants' administrator's honest belief in the need to issue disciplinary measures.

Beny disputes the defendants' conclusions regarding her alleged retaliation against her students and the concerning communications with faculty and staff members, but "arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest.*" *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (citation and internal quotation marks omitted).  Moreover, "a case alleging unlawful [discrimination] is not a vehicle for litigating the accuracy of the employer's grounds for [discipline]."  *Tingle*, 692 F.3d at 530. The defendants conducted a thorough investigation into Beny's handling of her course and her numerous inappropriate communications to faculty and staff members, resulting in a discipline letter that cited three grounds.  The defendants' later decision to grant Beny retroactive FMLA leave does not shield her from discipline for misconduct that occurred, and it is insufficient to call into question the defendants' honest belief in their explanation of the disciplinary action.

Beny also takes issue with a statement in the discipline letter that "[t]he concern that you might have access to weapons is a frequent topic of conversation among faculty members," Third Notice of Discipline, ECF No. 96-17, PageID.2714, and refocuses her argument on establishing that the defendants' decision to conduct a threat assessment of her was unreasonable.  She also accuses defendant West of falsely testifying that he did not initiate the 2022 threat assessment when the report lists him as the complainant.  Perhaps these arguments are attempts to undermine the defendants' honest belief.  However, these arguments are insufficient to show that the administration's disciplinary actions lacked a factual basis.  West's deposition testimony about the threat assessment did not contradict the police report.  West stated that he was confident that he "was involved in the conversation and the decision" to conduct a threat assessment but that he did not "have a specific recollection of . . . me personally asking for the threat assessment to be done." Mark West dep., ECF No. 109-5, PageID.4131.  Even if there were reason to disbelieve West, the threat assessment itself is not a cited reason for the discipline.  And, in any event, the threat assessment itself actually is some evidence favoring the defendants' honest belief about the gravity of the situation.  After all, West testified that he was motivated to request it after he received an email from Professor Alicia Davis, another Black woman faculty member who was the recipient of Beny's "God will deal with you" communications, which indicated that she did not feel safe. Mark West dep., ECF No. 109-5, PageID.4133; ECF No. 111, PageID.4268.   The record reflects that Davis emailed West and Daugirdas on February 24, before West had requested the threat assessment, stating that she felt threatened by Beny's phone call and asking what actions the administration would take.  Emails, ECF No. 96-25, PageID.2728.  West also was encouraged to request a threat assessment by Professor Barbara McQuade after she reviewed Beny's emails to

the faculty.  Barbara McQuade dep., ECF No. 114, PageID.4531-32.  Despite Beny's protests, there is ample evidence that administrators honestly believed a threat assessment was necessary.

Instead, Beny's arguments obscure the reality that she has provided no rebuttal to several bases for the discipline, including the charge that she failed to attend faculty and committee meetings.  In fact, she admitted during her deposition that she sent the troubling emails and text messages listed in the disciplinary letter.  ECF No. 109-3, PageID.4040-41.  She maintains that her statement to one faculty member that "God will deal with you" was not a threat, but she admitted that she accused the faculty member of "undermining [her] on every opportunity that she got" and it certainly was interpreted as a threatening communication by Davis.  *Id.* at 4071.  She is hard-pressed to argue that the University's discipline had *no* factual basis or that "the employer's allegations never happened."  *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021).

Beny has not developed any other grounds for finding pretext in the defendants' proffered nondiscriminatory reasons for imposing the discipline that they meted out.  Given the scale of Beny's undisputed disruptive and unprofessional behaviors, and the defendants' proportionate responses, no reasonable jury could find that any adverse action was motivated by illegal discrimination on the basis of race or sex.  The defendants are entitled to a judgment as a matter of law on the discrimination claims.

## B.  Retaliation Claims

The defendants argue that the retaliation claims must be dismissed because the evidence conclusively shows that Beny cannot make out a *prima facie* case of retaliation.  The defendants reason that Beny's serial complaints of discrimination did not amount to reasonable opposition to an unlawful employment practice and therefore cannot constitute protected activity.  They also say that the complaints were substantively unreasonable and inappropriately made.  Alternatively, the

defendants contend that Beny's own misconduct, mainly her "abandonment" of her spring 2022 course, was the but-for cause of her March 2022 discipline and furnished a legitimate reason for that action. They also point out that Beny has suffered few, if any, adverse consequences despite her history of complaints, which demonstrates that the defendants retain employees who make complaints and do not retaliate against them.

Beny counters that fact issues exist on all the elements of her retaliation claims. Adverse action can be found, she says, in the decision not to select her to teach in one of their summer programs and in the March 2022 discipline. She maintains that 1) it is undisputed that the defendants knew of her prior race and gender-based complaints, 2) her pay freeze amounted to an adverse employment action, and 3) there is a causal connection between her complaints and the adverse employment action because of the two events occurred close in time and no other professors ever received discipline. She argues that the defendants' explanations for the adverse action were pretextual, again, because she did not abandon her class but was on a medical leave.

Title VII prohibits an employer from retaliating against an employee who has opposed an "unlawful employment practice." 42 U.S.C. § 2000e–3(a). Retaliation similarly is prohibited by ELCRA. *Rogers*, 897 F.3d at 771; *Radtke*, 442 Mich. at 381-82, 501 N.W.2d at 161-62. To establish a *prima facie* case of retaliation under Title VII, the plaintiff must demonstrate that: "(1) [s]he engaged in activity protected by Title VII; (2) h[er] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)). The plaintiff's burden of establishing a materially adverse employment action is "less onerous in the retaliation context than

in the anti-discrimination context," because a lower standard for material adversity applies. *Id.* at 731 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007)).  For retaliation to be actionable, a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (quotations omitted).  And the plaintiff must allege at least some facts that support the inference of a causal connection between the adverse action and the protected conduct.  *Laster*, 746 F.3d at 730-31.

After establishing a *prima facie* case, "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions."  *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 996 (6th Cir. 2009) (quoting *Canitia v. Yellow Freight Sys.*, 903 F.2d 1064, 1066 (6th Cir. 1990)).  "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'"  *Canitia*, 903 F.2d at 1066 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Although the second amended complaint does not explicitly say so, it could be read to advance two separate theories.  The first is that the defendants retaliated against Beny by issuing the March 31, 2022 discipline letter.  The second is that the defendants retaliated against her again by refusing to permit her to return to her full duties, including teaching students, after she filed her May 2022 charge with the EEOC.  The success of the first theory largely depends on the pretext arguments laid out more fully in the discussion of Beny's discrimination claim, above.  The second theory is not well-briefed, has had little factual development, will not defeat summary judgment, and need not be discussed further.

1. Protected Activity

The defendants maintain that Beny's "serial and vague" reports of discrimination do not qualify as protected activity.  They make an extended argument on this point, but it misses the obvious: regardless of whether all of her complaints across her time at the University were protected — she certainly made many complaints — Beny's decision to initiate an action with the University's ECRT office in November of 2021 clearly was protected activity.  Protected activities include filing an EEOC charge and opposing discriminatory practices by making complaints to management.  *See* 42 U.S.C. § 2000e-3(a); *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015).  Courts in this circuit consistently find that a complaint to a university internal office handling equity issues constitutes protected activity under Title VII.  *See, e.g.*, *Arthur v. Michigan State Univ.*, No. 1:19-cv-484, 2022 WL 1616947, at *4-5 (W.D. Mich. May 23, 2022); *Blessing v. Ohio Univ.*, No. 2:09-0762, 2011 WL 6076327, at *18-19 (S.D. Ohio Dec. 6, 2011). This Court held as much when adjudicating the motion to dismiss, *see Beny*, 2023 WL 4409107, at *10, and the defendants furnish no reason for the Court to revisit this conclusion now.

The defendants argue that Beny's complaint to the ECRT did not amount to a complaint about an unlawful employment practice because it focused on the operation of the MACL summer program.  That does not matter either, because Beny has introduced evidence that her 2022 complaint covered a broad range of conduct by University officials, even though the complaint was initiated because of her belief that she was excluded from the summer program.  In her interviews with ECRT, Beny raised the email exchanges with West.  Laura Beny dep., ECF No. 109-3, PageID.3993.  And a transcript of her December 2022 interview with the office includes discussion of her dissatisfaction with the prior disciplinary actions initiated against her.  Transcript, ECF No. 113, PageID.4406-08, 4412.  And the defendants do not address the fact that Beny made

a ECRT report on February 13, 2022, involving allegations about the defendants' interference with her Enterprise Organizations course.  Laura Beny dep., ECF No. 109-3, PageID.4017.  And she made a complaint with the EEOC in May 2022, and received a right to sue letter shortly thereafter. *Id.* at PageID.3999.  These were not "vague charge[s] of discrimination."  *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015).

Nevertheless, the defendants maintain that her complaints were either substantively unreasonable or inappropriately made, and they attempt to undermine their factual bases.  But these arguments raise fact questions.  And to the extent that, as a matter of law, some of Beny's conduct, such as her numerous emails to the faculty email list, could be so inappropriate or substantively unreasonable that they are not protected activity, *see Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000), the defendants cannot argue that Beny's filing of an ECRT complaint was inappropriate.  The plaintiff has introduced sufficient evidence at this stage for a jury to conclude that she engaged in protected activity.

## 2.  Defendants' Knowledge

Direct evidence of knowledge by the decision-maker of the protected activity is not required.  "[A] plaintiff may survive summary judgment by producing circumstantial evidence to establish this element of her claim." *Mulhall v. Ashcroft*, 287 F.3d 543, 552-53 (6th Cir. 2002). The defendants do not appear to contest knowledge of the plaintiff's protected activity.  Nor could they.  The March 2022 Notice of Disciplinary action explicitly recognizes Beny's view that she had been discriminated against.  ECF No. 96-17, PageID.2715; *see also* Laura Beny dep., ECF No. 109-3, PageID.3991 ("Between January and February of 2022, I informed Kristina Daugirdas, Michele Frasier Wing, and Mark West that I was filing — I was opening Civil Rights complaints again on the basis of race and gender.").  There is evidence in the record from which a jury could find the defendants knew of Beny's ECRT complaint.

- 34 -

### 3. Adverse Action

The defendants also agree that Beny sufficiently established that her disciplinary action constituted an adverse action. In addition, a refusal to permit Beny to return to teaching may constitute adverse action. In the retaliation context, a plaintiff may demonstrate adverse action if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (cleaned up). The reassignment of duties can be "materially adverse." *Id.* at 71. A jury plausibly could find that the defendants' decision to delay Beny's return to the classroom — in the context of academia — is an adverse action.

### 4. Causal Connection

To establish a causal connection, a plaintiff must produce evidence sufficient to support an inference that an employer took an adverse action because of the plaintiff's protected activity. *Bledsoe v. Tennessee Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 588 (6th Cir. 2022). This element "requires proof of so-called 'but-for' causation, meaning that the plaintiff must furnish evidence that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Mys v. Michigan Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). The Sixth Circuit has recognized that a plaintiff may be able to survive summary judgment based on a showing of temporal proximity between the adverse action and the protected activity alone. *Bledsoe*, 42 F.4th at 588 (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

The defendants contend that Beny's conduct after her complaints were made was the intervening cause of her discipline. Relying on *Mittman v. City of Toledo*, 156 F.3d 1231 (6th Cir. 1998) (table), the defendants also argue that Beny's temporal proximity evidence is insufficient to establish causation because she has had a long history of filing employment related charges

without consequence.  In response, Beny reiterates that the timing between her November 2021 and February 2022 ECRT complaints was critically proximate to her March 2022 discipline and argues again that the defendants have not taken action against white and male comparators.

The evidence regarding Beny's comparators, discussed above, and the temporal proximity between her ECRT complaints and discipline does go some way to creating fact questions on her retaliation claim, but it does not address fully the defendants' arguments.  In *Mittman*, the court of appeals discussed a plaintiff who, by his counsel's own admission, had been a "contentious" employee during his tenure for the numerous grievances he had filed.  156 F.3d at *1.  He complained that he had been retaliated against for his more recent complaints.  *Id.* at *2.  The court of appeals ultimately affirmed the district court's determination that he failed to establish a causal nexus, in part because "temporal proximity alone will not support an inference in the face of compelling evidence that the employer supported engaging in protected activity."  *Id.* at *4 (internal quotations omitted).  The court of appeals viewed as significant Mittman's employer's long tolerance of his numerous employment related claims.  *Ibid.*  Although *Mittman* is an unpublished case, the court drew its holding from *Moon v. Transport Drives, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987), which does have precedential authority.  The defendants here urge a similar approach, pointing out that Beny also has a long history of complaints that they have tolerated.  They point to West's testimony that he welcomed Beny's attempts to raise issues of discrimination at the law school.  Mark West dep., ECF No. 109-5, PageID.4187 ("I am grateful that she raised the issues.  I think we have points of agreement on diversity, equity, inclusion issues in the law school . . . .").  But this statement, standing alone, is insufficient to be considered "compelling evidence" of the University's willingness for employees to engage in protected activity.  Moreover, Beny's 2021 and 2022 complaints appear to have taken a more direct aim at West and other Law

School administrators than her past complaints, perhaps creating an additional motive for retaliation.

However, the defendants' intervening cause argument merits closer scrutiny. This is because "an intervening legitimate reason" for discipline "dispels an inference of retaliation based on temporal proximity." *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 472 (6th Cir. 2012). This argument derives some initial support from the scope of the misconduct cited in the Third Notice of Discipline, some of which Beny admits. But two problems stand out. First, drawing all reasonable inferences in Beny's favor, the timing of the discipline creates some grounds for suspicion. On February 8, 2022, Beny engaged in an email exchange with Wing complaining that she had "rubber stamped" West's prior disciplinary actions against her and "never once disputed his false claims" about her. ECF No. 113, PageID.4434. Wing responded that she "never witnessed any false claims" and "certainly would have reported" had she observed any. *Ibid.* The next day, Daugirdas, copying Wing, emailed Beny to set up a meeting regarding the anonymous student complaint in her Enterprise Organizations course. ECF No. 96-10, PageID.2682. When Beny demurred about meeting, Daugirdas emphasized that the student concerns were "urgen[t]." *Id.* at PageID.2681. However, Wing and Daugirdas had been aware of the student complaint since January 31. ECF No. 96-9, PageID.2676. A reasonable jury could view with suspicion this timing and interpret it as evidence of retaliatory motive by University officials. To be clear, the student complaint is not the cited reason for Beny's discipline, but Beny's response to it is, including her alleged "retaliation" against the students. Second, unlike many of the other cases accepting intervening cause arguments, Beny has provided at least some additional circumstantial evidence that supports a finding of causation. Wielfaert, Beny's academic assistant, testified that she was directed by her supervisor to report "anything out of the ordinary" during the Fall of 2021. Linda

Wielfaert dep., ECF No. 109, PageID.3862-63.  And in the 2018 threat assessment, defendant West is quoted as saying that Beny "will go right to the line of inappropriate behavior but never goes over it which keeps her from getting reported to Human Resources (HR)."  ECF No. 109-2, PageID.3965.  That evidence supports an inference that administrators were looking for an opportunity to discipline her.  Beny makes much of the defendants' decision to discipline her while she was on medical leave, but the discipline was at least partially attributable to conduct that occurred before the February 15 approved beginning of the leave and she has pleaded no FMLA claims.  Beny has produced sufficient evidence to create a jury question on the issue of causation.

5.  Pretext

Beny's retaliation claims once again falter at the pretext stage though.  The pretext analysis on a Title VII (and ECLRA) retaliation claim mirrors that on a Title VII discrimination claim. *Michael*, 496 F.3d at 593.  The defendants justify their March 2022 disciplinary action on Beny's decision to refuse to teach her course and her many emails to faculty and staff members.  ECF No. 96, PageID.2504.  The plaintiff's response is anemic and offers little more than her pretext arguments for her discrimination claim, which are unpersuasive.  She emphasizes again that the discipline could be viewed as pretextual because it cited principally her decision to "abandon" her course when she was, in fact, on a medical leave.  These arguments cannot carry the day.  A case could be made, based on several factors cited in the causation section above, that University officials kept a close eye on Beny's conduct.  But any extra attention should not have been surprising in the context of Beny's past discipline.  And a reasonable jury could not disregard the defendants' explanation for disciplining Beny following their meeting — during which there is no evidence she asserted a need for medical (or any other kind of) leave — and her continued threatening, disruptive, and unprofessional communications to faculty and staff.  Because Beny

- 38 -

has failed to meet her burden of showing the defendants' explanation was pretextual, the defendants are entitled to summary judgment on Beny's retaliation claims.

### C.  Equal Pay Act Claim

The defendants contend that Beny's Equal Pay Act claim is meritless because she did not perform the same work as her proposed comparator after she refused to teach her course, and there is no evidence that Beny's sex played a role in any differential pay.  Beny responds that she now makes approximately $50,000 per year less than her identified comparator, and she states that the defendants have not met their burden of showing that the pay gap was caused by a factor besides her sex when the disciplinary action causing the pay gap was based on discrimination and retaliation.

The Equal Pay Act prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work.  29 U.S.C. § 206(d)(1).  Under the Act, pay differentials are allowed when based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . ."  *Ibid.*

To establish a *prima facie* case of wage discrimination under the EPA, the plaintiff must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)).  A plaintiff can establish a violation of the Act if she shows that the defendant paid her less compensation — however measured — than male counterparts for the same work.  No showing of discriminatory intent is required.  *Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 752 (6th Cir. 2016).

After the plaintiff establishes a *prima facie* case, "the defendant must 'prove' that the wage differential is justified under one of the four affirmative defenses set forth under section 206(d)(1) listed above. *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998). Defendants bear the burden of production and persuasion on these affirmative defenses. *Schleicher*, 831 F.3d at 753. The fourth exception, the catch-all, relied upon by the defendants here, "permits a 'factor other than sex' to be an affirmative defense only if, 'at a minimum, [it] was adopted for a legitimate business reason.'" *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (quoting *Beck-Wilson v. Principi*, 441 F.3d 353, 365 (6th Cir. 2006)). If a defendant meets its burden of showing an affirmative defense, the plaintiff, at the third stage, "must produce evidence creating a triable issue of fact as to whether the defendant's proffered explanation was pretextual." *Briggs*, 11 F.4th at 508.

The parties dispute whether the plaintiff has performed the same work as her proposed comparator and whether the defendants' have met their burden of showing that any disparity was motivated by a factor other than sex. The plaintiff proposes as a comparator Professor John Pottow, a member of her faculty cohort whose pay should have moved in "lock-step" with her own. The defendants concede that Beny now has a disparity in pay with Pottow, ECF No. 96, PageID.2511, but they argue that Beny did not perform the same work as he because she "abandoned" her course, and they note that the disparity resulted as a consequence of Beny's discipline and therefore is legitimate. The former argument is belied by the defendants' own decision to retroactively grant the plaintiff a medical leave to the date they say she effectively ceased performing the same work as her comparator. But the latter argument, which goes to pretext, favors the defendants.

The Sixth Circuit has explained that defendants are entitled to summary judgment "only if the record shows that [they] established the ['factor other than sex'] defense so clearly that no rational jury could have found to the contrary." *Briggs*, 11 F.4th at 508 (quoting *Schleicher*, 831 F.3d at 753). Such is the case here. An employer's decision to freeze an employee's pay for disciplinary reasons is a legitimate explanation for a pay differential. *See Allender v. Univ. of Portland*, 689 F. Supp. 2d 1279, 1287 (D. Or. 2010). The plaintiff does not argue otherwise. For the reasons explained above, Beny has failed to establish that the defendants' reasons for disciplining her were pretext for a sex or race-based motives. The defendants therefore were entitled to pay her differently. They are entitled to a judgment as a matter of law on this claim.

### III.  Conclusion

The undisputed facts in this record show that the defendants took disciplinary action against the plaintiff because of her disruptive and unprofessional conduct, and not because of her race or sex or because she engaged in protected activity. They delayed her pay increases based on a factor other than sex. The defendants are entitled to a judgment as a matter of law on all of Beny's remaining claims. The parties also filed motions challenging each other's expert witnesses. Because the case will not proceed to trial, the Court will not address those motions, and they will be dismissed as moot.

Accordingly, it is **ORDERED** that the defendants' motion to for summary judgment (ECF No. 96) is **GRANTED**.

It is further **ORDERED** that the case is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the motions to exclude the parties' respective expert witnesses (ECF Nos. 97, 98) are **DISMISSED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 17, 2024